LACKEY ET UX. *v.* BULLARD ET AL.

[No. 461, September Term, 1970.]

*Decided June 3, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY and SMITH, JJ.

*David S. Goldberg,* with whom was *Victor L. Crawford* on the brief, for appellants.

No brief filed on behalf of appellees.

HAMMOND, C. J., delivered the opinion of the Court.

In 1961 the appellants, Harry T. and Elizabeth Anne Lackey, entered into a joint venture or partnership with the appellee Robert E. Bullard, and Raymond J. Knoll, to purchase some thirty-five acres of land in Montgomery County. Harry Lackey was a builder and developer, Bullard a lawyer, and Knoll an engineer. Each was to contribute his respective training, talents and skills in efforts to enhance the value of the property so that it could be sold at a profit. The land was sold in three parcels between 1961 and 1963 at prices the Lackeys say were grossly inadequate and since the last sale they have been trying to recover from Bullard one-third of the amount they think the land should have brought if sold for its true value, and from appellee Arthur J. Williams, a real estate broker, the commissions he received as the procuring cause of the three sales.

In March 1964 the Lackeys filed a bill of complaint against Bullard and Williams in an effort to achieve their monetary goal. A summary judgment was entered for the defendants, and then vacated. Full, indeed prolonged, discovery was availed of by both sides. In May 1969 the case was transferred by Judge Pugh to the law side and the parties directed to file appropriate pleadings. In July 1969 an amended declaration was filed and on October 26, 1970, the case went to trial before Judge Miller and a jury.

The declaration contained four counts—the first for breach of contract, the second for deceit, the third for money had and received, and the fourth for money found to be due the plaintiffs by the defendants. At the end of the plaintiffs' case, when the court was considering the motions of the defendants for directed verdicts—we find

no substance to the Lackeys' claim that the court could not direct a verdict for Williams because he never moved the court to do so—the Lackeys explicitly withdrew their claims based on counts three and four, and at least implicitly withdrew reliance on count one, saying that they based their claim on "a cause of action which basically sounds in the tort of fraud and deceit." The essence of the Lackeys' contention as to fraud was that Bullard was a lawyer of the purchasers and did not disclose this fact to the Lackeys, that Williams was not the procuring cause of the sales, and that he and Bullard conspired to sell the land at an inadequate price in order to benefit his clients, the purchasers (even though this would have cost him money as an owner of a one-third interest), and make available to Williams commissions he had not earned. (There is the shadowy hint, which is never really articulated, that Bullard and Williams split the commissions.)

Judge Miller directed verdicts for Bullard and Williams, saying: "[T]his is one of the most frivolous lawsuits that I have ever had occasion to hear in the nine years on the bench." While we do not adopt Judge Miller's characterization of the worth of the case, we do think that he had no choice but to find that no cause of action had been proven.

The plaintiffs proved by Harry Lackey, by a real estate appraiser, and by the adverse witnesses Bullard and Williams, that a tract of some 35 acres had been bought in 1961 for $52,416 with $15,700 paid in cash and the balance secured by deed of trust, that Bullard put up some $16,000 in cash and that on May 31, 1961 the Lackeys, Raymond Knoll and Bullard signed an agreement that the Lackeys would hold title to the tract as trustees until the property was deeded to 27 Jefferson Street, Inc. (a paper corporation Bullard had previously organized to hold title to another property but which had not been used, and of which Bullard and Williams were officers and directors) for the use and benefit of the Lackeys as

an entity as to a one-third, of Knoll as to a one-third, and of Bullard as to a one-third. It was further agreed that "the said parties would be entitled to a refund out of the first sale proceeds of any of the said property of the amounts paid by them toward the purchase of the same; said amounts to be due them in addition to their one-third interests as aforesaid." The testimony for the Lackeys further was that Bullard and Williams and Knoll had been friends from their military service days, that Knoll found the property and interested Bullard and the Lackeys in it, that the Lackeys signed a deed of the property to 27 Jefferson Street, Inc. on May 31, 1961 and delivered it to Bullard, that Bullard procured a rezoning of three acres of the property from rural residential to light industrial, that Williams had his office in a building owned by people named Tidler, and obtained from one of them, Edna Tidler, a contract to buy three acres of the property for $20,000 with an option to buy an additional eleven acres for $20,000 more, that the Lackeys signed the contract, which recited that Williams was the procuring cause of the sales and entitled to commissions on both sales and also signed the subsequent deeds, and that Williams received two commissions of $2,000 each. It was also made known to the court and the jury that these two sales were necessary to provide funds to make the payments on the mortgages on the land.

There was further testimony that four or five months after the second sale Bullard advised the Lackeys (who had not either before or after the two sales put up the money they had agreed to pay on the mortgage instalment payments) that in order to avoid foreclosure it would be necessary to sell the remaining twenty-one acres and that Williams had procured one Harold Tidler as a buyer who would pay $43,800. The Lackeys refused to agree to the sale so Bullard, with Knoll's consent, recorded the deed to 27 Jefferson Street, Inc. and made the sale by deed from Jefferson, paying Williams a commission of $4,380 as the procuring broker. Bullard sent the

Lackeys a check for their share of the profits from the final sale but they would not accept it. The Lackeys' real estate expert testified that the property was worth, when it was sold, almost twice the price received. Williams testified he advertised the tract for sale in several newspapers for over a year and made various other efforts to sell it. Bullard testified that the prices received did not reflect what a willing seller might have received because the sales were absolutely necessary in order to pay the mortgage instalments coming due, and so avoid foreclosures. He had not met Mrs. Tidler when the first sale was made, and bought tax certificates for her because Williams asked him on her behalf to be the bidder. He did do legal work for her thereafter, including work in regard to the property after she bought it.

It is on this testimony that the Lackeys say that Bullard and Williams were "more or less" co-conspirators, who "conceived and carried into execution a plan to sell [the property] for substantially less than [its] fair and reasonable market value," in order to benefit the Tidlers and give Williams commissions he did not earn. They find support in the fact that when at the close of the plaintiffs' case their counsel was arguing to Judge Miller that all the evidence raised "a permissible inference of hanky-panky to put it in the vernacular," Judge Miller replied: "That is exactly what we have, a permissible inference." While we may doubt that the reporter correctly understood and reported what Judge Miller said, there is no doubt as to what he held, and, we think, correctly held. He ruled:

"these three parties entered into an agreement, hopefully * * *.

"Things did not profit. Things did not materialize in that direction, and the property was sold with the consent of two-thirds of the partners. The other third partner said he did not like it.

"In addition to that, he said he has a suspicion

that something went wrong, because the lawyer continued to represent the purchaser of the properties and had known her before that time.

"He says absolutely no evidence of fraud, no evidence of any deceitful statements.

"All he says is there is evidence of a severe disappointment at the outcome.

"There is some evidence, viewing the evidence in the best light, from the Plaintiffs' point of view that the property may have been sold too cheaply.

"But even aside from that, even assuming that was the case, the mere fact that it was sold too cheaply does not amount to fraud, deceit, breach of any contract. If that was the case, and the Court is not convinced at all from the evidence if the case went ahead that it would be the case, even that would not make out this kind of a case.

"The Court grants a directed verdict as to Counts One and Two as to both Defendants."

The Lackeys charge deceit. It is well settled that the foundation of an action for deceit is actual fraud and nothing short of actual fraud will support it. *Babb v. Bolyard*, 194 Md. 603, 609. Since this was an action at law the Lackeys could not rely on the principle of confidential relationship, that useful tool of equity (assuming that it otherwise would be applicable), but had to meet the burden of proving fraud and were bound by the testimony of those they called as adverse witnesses. *Mullan, Exec. v. Mullan*, 222 Md. 503, 506-508. That burden is a heavy one. More than a preponderance of evidence must be produced. Fraud can be established only by clear and convincing proof. *Govane Bldg. Co. v. Sun Mtge. Co.*, 156 Md. 401, 405; *Peurifoy v. Congressional Motors*, 254 Md. 501, 517. In determining whether there was sufficient evidence upon which to submit the issue of fraud to the jury, we must examine all the evidence offered that

favors the plaintiffs, assume its truth and consider it, together with all reasonable inferences that can be drawn therefrom and decide whether the jury, as reasonable men and women, could reach a rational conclusion that fraud had been perpetrated on the plaintiffs. *Tufts v. Poore*, 219 Md. 1, 8. We think there was no evidence here that would permit reasonable men and women to reach the rational conclusion that there had been fraud. At best there is only suspicion, which is what Mr. Lackey in terms said was what he had, and really there is very little basis even for suspicion, as Judge Miller's analysis of the situation reveals.

*Judgment affirmed, with costs.*