The EQUITABLE TRUST COMPANY,
Plaintiff,

v.

G & M CONSTRUCTION CORPORA-
TION and H. Wendell Gardner,
Defendants,

v.

The EQUITABLE TRUST COMPANY,
Counter-Defendant and
Third-Party Plaintiff,

v.

UNITED STATES of America Small
Business Administration,
Third-Party Defendant.

Civ. A. No. J–80–1769.

United States District Court,
D. Maryland.

Aug. 9, 1982.

[black redaction bar]

Richard P. Kidwell, David F. Clinnin, Baltimore, Md., for plaintiff.

Robert L. Bloom, Baltimore, Md., C. Edward Hitchcock, Towson, Md., Steven J. Riegel, U. S. Dept. of Justice, Washington, D. C., for third-party defendant.

## MEMORANDUM AND ORDER

SHIRLEY B. JONES, District Judge.

The Equitable Trust Company (ET) sued G & M Construction Corporation (G & M) for breach of contract and G & M and H. Wendell Gardner for fraud. Defendants filed a counterclaim for breach of contract and conversion against ET and a third-party claim against the Small Business Administration (SBA). ET filed a third-party claim against SBA, on which liability was conceded. Trial of liability was bifurcated from damages with respect to defendants' counterclaim and third-party claim, and the case was tried, except for the issue of damages, to the Court on November 2, 3 and 23, 1981. Proposed findings of fact were submitted by the parties and exchanged, and posttrial memoranda of law were submitted. This opinion constitutes the Court's findings of fact and conclusions of law.

SBA entered into a contract, pursuant to Section 8(a) of the Small Business Act, as amended, 15 U.S.C. § 637(a), with the General Services Administration (GSA) on September 29, 1978 to perform certain work on the Social Security Administration Administrative Headquarters Expansion Project, Metro West, Baltimore, Maryland (the Metro West project) and in turn subcontracted that work to G & M. (SBA Exs. A, B).[1] The contract designates George Ferensky as SBA contracting officer.

G & M applied to SBA for an advance payment of $120,000 in November 1978 to finance start-up costs, and began work on the project in December 1978. The advance payment was approved, and an advance payment contract was signed on March 1, 1979.[2] (SBA Exs. F, G). Joseph Monteleone signed as SBA contracting officer. At the same time, pursuant to the advance payment contract, a special bank account agreement was executed by G & M, ET and SBA. (ET Ex. 1). It required, among other things, SBA approval of disbursements and signature of checks by a representative of G & M and of SBA. A Corporate Certificate of Authority (SBA Ex. E) authorizing the checking account and setting out the persons authorized to sign checks[3] was submitted by G & M. The advance payment funds were finally deposited in the account in April 1979.

Around August 1979 G & M began experiencing cash flow problems and applied to SBA for additional financing so that it could continue work on the Metro West project. Meetings involving G & M,[4] SBA, the general contractor and the GSA contracting officer, concerning the work to be done by G & M, were held in September and October, and on October 5, 1979 G & M quit work on the project. SBA had stopped authorizing disbursements from the special bank account in August 1979 and froze it on October 25, 1979.

Meetings were held by SBA regional office personnel with G & M in September and October 1979, primarily concerning G &

---

1. Exhibits of ET are designated herein as ET Ex., those of defendants as G & M Ex., and those of SBA as SBA Ex.

2. A modification (SBA Ex. F) to the original contract, incorporating advance payment provisions (SBA Ex. G) was executed on behalf of SBA on March 1, 1979. It is referred to as the advance payment contract herein.

3. The resolution and signature cards were later changed to add an additional authorized signature on behalf of SBA (ET Ex. 5).

4. H. Wendell Gardner, president of G & M, participated in all these meetings. Other G & M employees also participated in some meetings and conferred with consultants assigned by SBA. Gardner was the G & M principal involved in negotiations with SBA throughout the relevant period.

M's financial problems, in an effort to resolve its efficiency and cash flow problems. Two meetings were held with SBA national representatives in Washington, D. C., one in November 1979 and one on December 7, 1979. At the latter meeting specific figures were discussed, and general approval for a $412,000 loan to G & M was given.

The loan papers and some supporting documents were prepared, and on December 27, 1979, they were signed by Gardner and the SBA regional director. The $412,000 check for the loan proceeds, which had been requested earlier in the expectation that the loan would be consummated shortly, arrived at ET on January 10, 1980 and was deposited in the special bank account on January 11, 1980. One of the conditions of the loan was that Gardner obtain a life insurance policy. (SBA Ex. T, ¶ 3(c)(2)). The policy was never supplied, although in January and most of February 1980 all parties, including SBA representatives, were proceeding on the assumption that this and other "loose ends" would be tied up and the loan finalized. A meeting was held at SBA offices in Philadelphia on January 24, 1980, with G & M and outside management consultants to discuss what steps to take to get G & M back on the job.

On February 13, 1980, after telephone conversations with ET and authorization from Les Lewis, two SBA employees, Edward Hitchcock and O. J. Phillips, visited the ET Pikesville branch and obtained a check in the amount of $412,000, payable jointly to G & M and SBA. Hitchcock was SBA district counsel, Phillips was the SBA district representative working on the G & M loan. A debit memorandum was issued immediately. G & M, which had not been told of the SBA request for the check or the February 13 visit, learned of the bank's action when it received the debit memorandum a day or two later. The testimony was conflicting as to the reason for the SBA's action, but I find credible Hitchcock's explanation that the money was withdrawn because of a fear that the Internal Revenue Service was planning to attach the account to recover taxes owed by G & M in connection with Metro West and other projects.

Gardner took a corporate resolution changing the signatures on the special account, to remove the SBA representatives, and a new signature card to the Pikesville branch on February 26, 1980. They were accepted, and the new signature card was filed. The next day, Gardner returned to the branch and wrote two checks on the Metro West account payable to G & M Construction (ET Exs. 10, 11), depositing one in another G & M ET account, No. 671–0928–1 (ET Exs. 10, 15B), and the other in a G & M account, No. 609–338–8 at another bank (see ET Ex. 11). The two checks were in the amounts of $100,000 and $87,000. The Pikesville branch manager, William R. Pearce, with whom Gardner dealt on February 27, 1980, did not check the signature cards on the Metro West account in permitting these transactions. Also on February 27, 1980, a meeting was held at SBA national headquarters in Washington, D. C. at which a decision was made not to proceed with financing G & M. It is unclear which of the two actions on February 27, Gardner's visit to the bank or the meeting in Washington, occurred first.

Gardner returned to the bank on February 28, 1980 and from the other G & M account he paid off two outstanding loans and had a $60,000 treasurer's check issued to himself. When he tried to cash it a few days later, the branch manager refused to cash it and kept the check. On February 28, 1979 Gardner had a certified check payable to the Internal Revenue Service issued out of the Metro West account (ET Ex. 12).

SBA learned of Gardner's removal of funds from the special bank account on February 28, 1980, and the district director immediately called ET to advise that SBA would hold the bank responsible for the release of funds. A few weeks later ET placed a "hold" on all G & M accounts. The $412,000 check payable jointly to SBA and G & M was returned to the bank and reissued payable only to SBA on March 27, 1980. ET attempted to trace the funds originating in the special bank account in G

& M's other accounts. It charged funds in those accounts against the total amount withdrawn and paid SBA $20,895.59 on June 4, 1980 (ET Exs. 15, 16). It paid $60,000, representing the uncashed treasurer's check on May 8, 1980 (ET. Ex. 17).

This action was removed from the Superior Court of Baltimore City upon petition of the United States when SBA was joined as a third-party defendant. Jurisdiction was asserted under 28 U.S.C. § 1441(a) and 15 U.S.C. § 634(b)(1),[5] and the entire case was removed pursuant to § 1441(c). For reasons discussed below, an alternate basis of jurisdiction over the claims of ET against the defendants is 28 U.S.C. § 1331 and this Court's pendent jurisdiction.

Although not heretofore raised, there is a question whether federal law or state law is to be applied in construing the special bank account agreement and deciding whether it was breached. If federal common law governs interpretation of the contract in the first instance, a further question may arise as to whether state law should be applied by incorporation. *Cf. Quadrini v. Sikorsky Aircraft Div.,* 425 F.Supp. 81, 84–85 (D.Conn.1977) (discussing questions of application of federal and state law in action based on federal statute).

There is no direction in the contract concerning the law to be applied to it, nor did the trial testimony shed much light on the question. When federal common law not specifically authorized by statute is to be fashioned and applied is not entirely clear. 19 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4514 (1982). A leading commentator suggests that there are three contexts, not necessarily mutually exclusive, in which federal common law has developed: where there is conflict between a federal policy and the use of state law, where federal statutes dominate the area, and where there is a strong federal or national concern. *Id.* § 4514 at 223–24.

The special bank account agreement was executed in compliance with the advance payment provisions (SBA Ex. G, ¶ 2). The advance payment provisions are referred to in the agreement, and the bank is bound by them with respect to deposit and withdrawal of funds. SBA is a party to this three-party contract, and its rights and duties, as well as the other parties' rights and duties under it, are at issue here. The advance payment agreement does not require that SBA be a party to the bank account agreement, only that the contractor submit a special account agreement in a form acceptable to SBA (SBA Ex. G, ¶ 12).

The testimony at trial was not clear whether the agreement was prepared by SBA or ET. It is a form contract with blanks left for dates, names of parties, contract and account numbers, and state of incorporation. Even if the form was completed by ET personnel, internal evidence is that the form was prepared by SBA. The first paragraph, without the blanks completed, reads:

Agreement entered into this _____ day of _____ between the SMALL BUSINESS ADMINISTRATION, hereinafter called the SBA, represented by the Contracting Officer, executing this Agreement, _____, a corporation under the laws of the State of _____, hereinafter called the Contractor, and _____, a banking corporation under the law of the State of _____, located at _____, hereinafter called the Bank.

That SBA is named in the standard form language portion, but the bank, as well as the contractor, is not, indicates that the source of the form is SBA, not ET.

The obvious purpose of the agreement is to secure the money advanced by SBA by putting the bank on notice of, and making it a party to, the special deposit and withdrawal requirements. Detailed regulations concerning advance payments, 13 C.F.R. § 124.1–2 (1980), including some specific re-

---

**5.** 15 U.S.C. § 634(b)(1) authorizes the SBA administrator to sue and be sued in state courts of general jurisdiction and United States district courts "and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy."

quirements for the special bank account, *id.* § 124.1–2(c)(1)(ii), were enacted on May 29, 1979. 44 Fed.Reg. 30679. They had been proposed on January 25, 1979, *see id.* at 30672, but were not in effect at the time of the bank account agreement at issue.

■ The combination of circumstances outlined above dictates application of federal law in the first instance to the contract at issue. It was drafted by SBA in conjunction with the advance payments authorized under the contract with G & M. Federal law has been applied in construing government contracts, including SBA instruments,[6] in actions between the SBA and the other parties to the contract. *United States v. Southern Cycle Accessories, Inc.*, 567 F.2d 296, 297 (5th Cir. 1978) (per curiam) (applied without discussion); *United States v. Lowell*, 557 F.2d 70 (6th Cir. 1977).

Federal law would govern if only SBA had been sued on the agreement, because of the federal interest in having the rights and obligations of SBA governed by federal law. In addition, although G & M is a party to the agreement, the covenants deal with the rights of SBA and the obligations of the bank. G & M's obligations are dealt with in the advance payment provisions of its contract with SBA. Common sense dictates that if federal common law would govern in an action between SBA and ET, it governs in an action between ET and G & M. Principles of federal common law, therefore, apply to construction of the agreement.

Although the interpretation of the contractual provisions is governed by federal common law, it does not necessarily govern all aspects of the contractual relationship between ET and G & M. Implicit in, or underlying, the special bank account agreement is the ordinary relationship created when a bank account is opened. The contract does not speak to all rights and duties arising out of that relationship.

The interest of SBA in obtaining a lien on the account funds and securing a bank's agreement to special deposit and withdrawal procedures, which are related to SBA's broader concern with carrying out its authority to enter into subcontracts for the benefit of minority small businesses, does not extend to the other aspects of the relationship between ET and G & M. Although there is need for uniformity of law in the construction of special bank account agreements into which SBA has entered, there is no such need simply because a bank account must be set up for deposit and disbursement of contract funds. State law should be incorporated into the federal common law applied in interpreting the special bank account agreement, and the law of Maryland, where the account was located and all transactions of ET and G & M took place, should be applied.

■ Federal common law is a "law of the United States" for jurisdictional purposes. 19 C. Wright, A. Miller & E. Cooper, *supra*, § 4514 at 220. The contract claim thus arises under federal law, and jurisdiction over ET's contract claim against G & M may be predicated on 28 U.S.C. § 1331. Jurisdiction over the common law fraud claim, and of G & M's counterclaims, is proper under the Court's pendent and ancillary jurisdiction, respectively. *See* 13 *id.* § 3567 (1975); 6 *id.* § 1414 (1971).

It is not settled whether federal or state choice of law rules determine what state's law applies to state claims pendent to federal question claims. *Compare Corporation Venezolana de Fomento v. Vintero Sales*, 629 F.2d 786, 795 (2d Cir. 1980) (federal choice of law rule) *with System Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1136 (3d Cir. 1977) (state rule). This Court has found no Fourth Circuit case on point.

In this case, although the federal and state choice of law rules differ, the result is the same. Federal courts apply the law of the state with the most significant relationship to the events and parties involved in

---

**6.** SBA regulations, although not binding on this Court, specifically direct that federal law apply to instruments evidencing SBA loans and se- curity interests in property, such as notes and mortgages. 13 C.F.R. § 101.1(d) (1980).

the claim. *Quadrini v. Sikorsky Aircraft Div.*, 425 F.Supp. 81, 88 (D.Conn.1977); *cf. J. Ray McDermott & Co. v. Fidelity & Cas. Co.*, 466 F.Supp. 353 (E.D.La.1979) (choice of law for construction of marine insurance policy). The parties to the tort claims, G & M, Gardner and ET, were at the time all citizens and residents of Maryland. The operative acts all took place in Maryland at the ET Pikesville branch. Maryland clearly has the most significant relationship to the occurrences and the parties. Maryland courts apply the law of the place of the tort, *e.g., Frericks v. General Motors Corp.*, 274 Md. 288, 296, 336 A.2d 118, 123 (1975), and both torts occurred in Maryland.

### Contract claims

■ The claim of ET against G & M and the counterclaim and third-party claims of G & M for breach of the special bank account agreement can be considered initially together. The general rule is that in order to recover on a contract, the plaintiff must have substantially performed its obligations to the time of breach, or there must be an excuse for his nonperformance. *See* 3A *Corbin on Contracts* § 709 (1962); 6 *Williston on Contracts* § 842 (3d ed. 1962); *cf. American Hot Rod Ass'n v. Carrier*, 500 F.2d 1269, 1273–74 (4th Cir. 1974) (applying North Carolina law). One party's material breach "excuses" the other's nonperformance in the sense that he may elect to treat the contract as terminated. *E.g., Cities Service Helex, Inc. v. United States*, 543 F.2d 1306, 1313 (Ct.Cl.1976); *see* 6 *Corbin on Contracts* § 1253. There may be circumstances in which both parties are in default, and neither may recover. *Cf. Hubler Rentals, Inc. v. Roadway Express, Inc.*, 637 F.2d 257, 260–61 (4th Cir. 1981) (applying Maryland law).

The first question then is whether ET materially breached the agreement in issuing the $412,000 check on February 13, 1980. If it did, in the circumstances of this case, it cannot recover against G & M and it would be liable to G & M, to the extent damages can be shown.

■ It was undisputed in the testimony, and I find as fact, that the check was issued solely upon the oral request of the SBA; G & M was neither advised nor consulted. Although the check was made payable to SBA and G & M and had not been negotiated, the amount was immediately debited from the account.

The agreement provides, in pertinent part:

(2) The BANK will be bound by the provisions of said contract relating to the deposit and withdrawal of funds in the above Special Bank Account, but shall not be responsible for the application of funds withdrawn from said account. After receipt by the BANK of written directions from the Contracting Officer designated in the Advance Payment Agreement mentioned previously, or from the duly authorized representative of the Contracting Officer, the BANK shall act thereon except that no check drawn payable to SBA's countersigning agent shall be honored and shall be under no liability to any party hereto for any action taken in accordance with the said written directions. Any written directions received by the BANK through the Contracting Officer or his authorized representative upon SBA stationery and purporting to be signed by, or by the direction of the Contracting Officer, or his duly authorized representative, shall insofar as the rights, duties, and liabilities of the BANK are concerned, be conclusively deemed to have been properly issued and filed with the BANK by the SBA.

Reading this provision with the advance payment agreement, it seems designed primarily to bind the bank as to the conditions with respect to deposit and withdrawal; to state the circumstances in which it must act, *i.e.*, upon written directions of the SBA contracting officer; and to limit its liability for so acting. The bank may act at its peril if it proceeds other than upon written directions at least purporting to come from the SBA contracting officer or his representative, but the clause does not prohibit its doing so.

The $412,000 check represented funds to be loaned by SBA to G & M. Although the principal documents had been signed, there remained some conditions to be fulfilled, provision of the life insurance policy and of a copy of a deed of trust on Gardner's home, so that a deed of trust securing this loan could be prepared (SBA Ex. U). The parties apparently all anticipated, as of February 13, 1980 and even thereafter (see SBA Ex. W), that the conditions of the loan authorization would be fulfilled shortly, but G & M was not entitled to disbursement or release of the loan proceeds. That being the case, the special bank account agreement was not yet applicable.[7]

Even if the conditions of the account were applicable because the $412,000 funds had been deposited in it, SBA's withdrawal and ET's permitting of the withdrawal upon oral authorization only cannot be regarded as a material breach because G & M, having no entitlement to the funds, could not be damaged by their withdrawal. Its possible future stake in the funds was not harmed, since the check withdrawing the funds was made payable to SBA and G & M. G & M was simply in the same position it would have been had the check not yet been issued or had the check been issued but held by SBA until all the loan conditions were fulfilled.

It was also undisputed in the trial testimony, and I find as fact, that Gardner secured the disbursement of approximately $256,000 out of the special bank account on the authorization of G & M only. Although G & M was purportedly treating the agreement as terminated because of the prior breach of ET, this Court has found no material breach in ET's act and hence provides no justification for G & M's actions. The breach was material; it was the very purpose of the agreement to prevent such a transaction. ET proved that SBA, which had a lien on the bank account for the unpaid balance of the advance payment, made demand on it for the money lost on

account of the unauthorized disbursements. After deduction of amounts ET collected from other G & M accounts, the balance due is $111,897.30. Judgment will be entered in favor of ET against G & M in that amount.

G & M is not entitled to recover on its counterclaim against ET, since it materially breached the agreement and ET did not. For much the same reasons that ET did not materially breach the agreement in issuing the $412,000 check, the SBA did not materially breach it by securing the check. G & M is not entitled to recover on its third-party claim against SBA.

### Fraud Claim

The elements of a cause of action for fraud, or deceit, in Maryland are:

(1) the making of a false representation;

(2) which is either actually known to be false or made with reckless indifference to truth;

(3) for the purpose of defrauding the party claiming injury;

(4) the person to whom it is made must have relied on it, in the full belief of its truth, so that he would not have done the act from which injury resulted had the misrepresentation not been made; and

(5) he must have suffered damage directly resulting from the fraudulent misrepresentation.

E.g., Martens Chevrolet, Inc. v. Seney, 292 Md. 328, 333, 439 A.2d 534, 537 (1982) (dictum), (quoting Gittings v. Von Dorn, 136 Md. 10, 15–16, 109 A. 553, 554 (1920)). Fraud may result from the deliberate concealment of material facts, as well as a false statement of material facts, Parish v. Maryland and Virginia Milk Producers Ass'n, 250 Md. 24, 72, 242 A.2d 512, 539 (1968), appeal after remand, 261 Md. 618, 277 A.2d 19, cert. denied, 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253 (1971); Polson v. Martin, 228 Md. 343, 349, 180 A.2d 295, 298 (1962), but only where the party is, because

---

7. The loan agreement required deposit of the loan proceeds in the special bank account. (SBA Ex. T, ¶ 3(b)(2)). Disbursements would presumably have been subject to the prior conditions on the account.

of a relationship of trust, under a duty to disclose, *id.; see Maryland and Virginia Milk Producers Ass'n*, 250 Md. at 74, 242 A.2d at 539–40.

■ A corollary principle that flows from the proposition that the allegedly defrauded person must have relied on the misrepresentation is that there is no redress where he failed to rely because of "their trivial character, because he was informed of the real facts and so could not be deceived thereby," or because he relied solely on information from other sources. *Savings Banks Retirement System v. Clarke*, 258 Md. 501, 507, 265 A.2d 921, 924 (1970) (quoting 37 C.J.S. "Fraud," § 29). Reliance must have been justified, although there is ordinarily no duty to investigate, *id.* at 507–08, 265 A.2d at 925 (dictum) (mere fact of access to land records would not have prevented reliance). James & Gray, Misrepresentation—Part II, 37 Md.L.Rev. 488, 511–18 (1978).

■ The burden of proving fraud is greater than the normal preponderance of the evidence standard. *First National Bank v. United States Fid. & Guar. Co.*, 275 Md. 400, 411, 340 A.2d 275, 283 (1975); *Lackey v. Bullard*, 262 Md. 428, 433, 277 A.2d 593, 596 (1971). The burden has been described as requiring "clear and satisfactory" proof of "such a character as to appeal strongly to the conscience of the court," *First National Bank*, 275 Md. at 411, 340 A.2d at 283, or "clear and convincing" proof, *Lackey*, 262 Md. at 433, 277 A.2d at 596.

■ ET identifies as fraudulent Gardner's false representation on February 26, 1980 to Eileen Bentzen, that G & M was authorized to change signatures on the special bank account, by submitting a G & M corporate resolution and new signature card. ET allegedly relied on this representation in the next day or two, because Pearce checked the account signature card and, finding only Gardner's signature on it, authorized the withdrawals from the account. Gardner is also alleged to have told Pearce specifically, in connection with the transactions handled with him, that the SBA was no longer on the account, which Pearce "confirmed" by checking the signature card.

Gardner made, explicitly or implicitly, a false representation on February 26, 1980 when he submitted the G & M resolution and signature card to Bentzen. It was made with knowledge of falsity and for the purpose of inducing the bank to rely on it. The fact represented was material. Although there was a conflict in testimony, I find that Gardner had not told Les Lewis he intended to do this before February 26, 1980.

There is a question whether ET justifiably relied on this initial misrepresentation. There is no question that someone at the Pikesville branch knew of the terms of the special bank account agreement; the branch manager signed it on behalf of ET. It had come to Bentzen's attention when she spoke with Les Lewis on February 13, 1980 about issuing the $412,000 check. The account was titled only in the name of G & M, but its special nature was indicated on the signature cards by the notation "SBA" by some signatures. (ET Ex. 4) Bentzen handled the signature card transaction as a routine one, apparently accepting Gardner's representation that the SBA was off the account. She honestly relied on Gardner's representations.

■ Ordinarily, however, the knowledge of a corporation's agents, acquired while acting on behalf of the corporation, is imputed to the corporation. *Maryland Trust Co. v. National Mechanics Bank*, 102 Md. 608, 627–30, 63 A. 70 (1906) (officer's knowledge imputed to bank). Thus, the question arises whether ET justifiably relied on Gardner's misrepresentation when it, through its employees, had actual knowledge of the conditions on the special bank account. Although the diverseness of a corporate enterprise makes it very possible for the right hand not to know what the left knows, that may be one of the risks a large enterprise takes. In this instance, the Pikesville branch "knew" of the conditions, and the signature card for the G & M Metro West account was even marked "SBA."

Contributory negligence is not a defense to a fraud claim, however, although actual knowledge of the falsity of the representation made may well be. *Savings Banks Retirement System*, 258 Md. at 507, 265 A.2d at 924. It cannot be said that ET had actual knowledge of the falsity of the statement that the SBA was now off the account.

There is a further problem with reliance. The credible testimony and documentary evidence (ET Exs. 10, 11, 15B) establish that it was on February 27, 1980 that the checks in the amount of $100,000 (ET Ex. 10) and $87,000 (ET Ex. 11) were written to transfer funds from the Metro West account to other G & M accounts.[8] Pearce testified that he did not believe that he checked the signature cards for the Metro West account on February 27, 1980, because he would not have needed to. The import of his testimony was not that he did not check the cards because he was relying on representations that SBA was off the Metro West account, but rather that he did not think it necessary because funds were going from one G & M account to others.[9] He did not rely on the February 26, 1980 signature card in authorizing the February 27, 1980 withdrawal from the Metro West account.

Pearce testified that he did check the signature card, apparently for the Metro West account, on February 28, 1980, and found the one signature card. If true, this action does not constitute reliance at the time the representation was made. The treasurer's check was written on G & M's other ET account, however, and it may be that Pearce checked its signature card. In any event, ET did not sustain damage on account of any representations made in connection with this check, because it was not cashed and the proceeds were recovered.

The final transaction in connection with which fraud is claimed is the certified check

written on the Metro West account on February 29, 1980 in the amount of $69,219.11 (ET. Ex. 12). There was little or no testimony concerning this specific transaction. Pearce testified that Gardner came to the bank on February 27, 28 and 29, 1980 and that Pearce handled the transactions on February 27 and 28. The February 29 transaction was handled by a teller, S. Hunter (see ET Ex. 12). She did not testify at trial, nor did Pearce testify that standard practice was to check account signature cards before certifying a check. I cannot find, particularly in light of plaintiff's heavy burden in a fraud case, that ET relied on Gardner's false representations in issuing this check.

ET is not entitled to recover on its fraud claim.

### Conversion

H. Wendell Gardner claims that ET converted the $60,000 treasurer's check or its proceeds when it refused to cash the check and kept it. The transaction is governed in the first instance by provisions of the Uniform Commercial Code because the item involved is a treasurer's check. *Taylor v. Equitable Trust Co.*, 269 Md. 149, 156, 304 A.2d 838, 842 (1973). The Uniform Commercial Code, Md.Comm.Law Code Ann. § 3–419(1) (1975), provides that an instrument is converted when "[a] drawee to whom it is delivered for acceptance refuses to return it on demand" and that the holder of an instrument "whether or not he is the owner may transfer or negotiate it and, except as otherwise provided in § 3–603 on payment or satisfaction, discharge it or enforce payment in his own name," *id.* § 3–301. Gardner was a holder of the treasurer's check, *id.* § 1–201(20); the UCC treats a negotiable instrument as the holder's property. *Id.* § 3–419, Comment.

 A treasurer's or cashier's check is a bill of exchange drawn by the bank on

**8.** The ET statement for the relevant period (ET Ex. 15B) shows that the check deposited in another ET account was processed on February 27, the one deposited in a Mercantile account was processed the next day.

**9.** Pearce was aware, from prior transactions, that checks on the G & M account required two signatures, although it was not entirely clear whether he realized the other signature required was that of an SBA representative or the significance of that requirement.

itself, so that its issuance constitutes acceptance. *Swiss Credit Bank v. Virginia National Bank-Fairfax*, 538 F.2d 587 (4th Cir. 1976) (per curiam); Retman, et al., 6 Banking Law ¶ 123.04. It generally cannot be dishonored because of a failure of underlying consideration. *Swiss Credit Bank*, 538 F.2d at 588.

This Court has found, and the parties have cited, no Maryland post-UCC case on point. The United States Court of Appeals for the Fourth Circuit was presented with a somewhat similar factual situation in a bankruptcy case, in which the receiver sued on a cashier's check issued to the debtor. The Court held that the bank's claims against the debtor could not be set off against the instrument, but they could be set off against the estate under bankruptcy law. *Matter of Johnson*, 552 F.2d 1072, 1077–78 (4th Cir. 1977). The Court noted that the bank had no right of dishonor based on its theory that the cashier's check was fraudulently obtained. *Id.* at 1078 n. 5. It conceded that this might not also be true where a payee seeks to collect on a fraudulently obtained cashier's check, but found the requisite degree of fraud absent because the bank was paid for the check. *Id.*

The United States Court of Appeals for the Third Circuit dealt with the question of recovery on cashier's checks by a payee participating in a fraudulent scheme to procure the checks in *TPO Incorporated v. FDIC*, 487 F.2d 131 (3d Cir. 1973). Reviewing the district court's grant of summary judgment against the bank, the Court held that the bank was entitled to present defenses available in a contract action, pursuant to U.C.C. §§ 3–306 and 3–408. *Id.* at 136.

■ In the absence of controlling authority,[10] I believe the Maryland Court of Appeals would follow the approach and reasoning of the Third Circuit. As that court noted, this action concerns no third parties or holders in due course. "The strong considerations of public policy favoring negotiability and reliability of cashier's checks are

not germane." *Id.* at 135. Holders of instruments are of two classes under the U.C.C., holders in due course and others. To be a holder in due course, one must take for value, in good faith and without notice of any defense against or claim to it on the part of another. Gardner does not meet this qualification. If he is not a holder in due course, he takes an instrument subject to valid claims to it on the part of any person, *id.* § 3–306(a), provided the third person intervenes in the action to assert his claim, *id.* § 3–306(d), and subject to all defenses available in a contract action, *id.* § 3–306(b). The burden of establishing such a defense rests on the obligor. *See id.* § 3–307(2).

■ Although I have held above that the claim of fraud on account of the $60,000 check cannot succeed because sufficiently clear proof of reliance was not presented, ET has presented sufficient evidence of failure of consideration. Before the $100,000 withdrawn from the special account was deposited in the second one, the balance was $42.00. *See* G & M Ex. 3A. The consideration for the treasurer's check was funds to which G & M was not entitled.

Gardner's claim for conversion must be denied.

## JUDGMENT ORDER

For the reasons set forth in the foregoing Memorandum, it is, this 9 day of August, 1982 by the United States District Court for the District of Maryland, hereby

ORDERED:

1. That judgment is hereby entered in favor of The Equitable Trust Company against defendant G & M Construction Corporation on Count One of the complaint for breach of contract, in the amount of $111,897.30, with interest and costs.

2. That the claim of The Equitable Trust Company against H. Wendell Gardner and G & M Construction Corporation in Count Two for fraud is dismissed with prejudice. Judgment is hereby entered

---

**10.** The Fourth Circuit's decision in *Johnson* was based on Virginia law, although, of course, a UCC provision was involved.

in favor of defendants and against plaintiff on said claim.

3. The counterclaims of G & M Construction Corporation and H. Wendell Gardner against The Equitable Trust Company are dismissed with prejudice. Judgment is hereby entered in favor of The Equitable Trust Company and against defendants/counter plaintiffs on said claims.

4. The third-party claim of G & M Construction Corporation against United States of America, Small Business Administration is dismissed with prejudice. Judgment is hereby entered in favor of the United States, Small Business Administration, and against defendant/third-party plaintiff G & M Construction Corporation.

5. A finding of liability of the United States, Small Business Administration, to The Equitable Trust Company is made on the third-party claim of The Equitable Trust Company. Since no damages were sustained by Equitable, however, in light of this ruling, judgment is entered in favor of Equitable against Small Business Administration for costs.

6. The Clerk is instructed to send a copy of this Memorandum and Order to counsel for the parties.