685 A.2d 1189

**FAIRFAX SAVINGS, F.S.B.**

v.

**WEINBERG AND GREEN.**

**No. 1707, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Dec. 6, 1996.

590

Benjamin Rosenberg (Douglas J. Furlong, Brenda J. Wilson and Rosenberg Proutt Funk & Greenberg, L.L.P., on the brief), Baltimore, for appellant.

Michael S. Sundermeyer (Brendan V. Sullivan, Jr., Nancy F. Lesser, Lynda Schuler and Robert M. Cary, on the brief), Washington, DC, for appellee.

Argued before WENNER, FISCHER and SALMON, JJ.

SALMON, Judge.

On October 20, 1992, appellant Fairfax Savings, F.S.B. ("Fairfax"), filed a complaint against appellee Weinberg and Green ("the firm") in the Circuit Court for Montgomery County, alleging legal malpractice in the firm's drafting of loan documents and breach of fiduciary duty in the firm's representation of Fairfax during litigation resulting from a default on the loan. Fairfax filed a second amended complaint on June 20, 1994, adding claims arising out of the firm's fraudulent overbilling of Fairfax.

The case was tried before Judge Ann S. Harrington beginning April 10, 1995. At the close of Fairfax's case, Judge Harrington granted the firm's motion for judgment on several counts, including indemnification and malpractice based on violation of the advocate/witness rule.[1] In this appeal, Fairfax does not take issue with the court's partial grant of the firm's motion for judgment. After Weinberg and Green presented its case, Judge Harrington held the case *sub curia* and, on August 30, 1995, filed a well-reasoned seventy-four page opinion in which she found that the firm had breached the applicable standard of care in its representation of Fairfax in the loan transaction and had engaged in systematic overbilling of Fairfax. Despite these findings, however, Judge Harrington entered final judgment in favor of Weinberg and Green on all remaining counts. She determined that the breach of the applicable standard of care did not proximately cause Fairfax injury and, in any event, all claims were barred either by the

---

1. *Maryland Rules of Professional Conduct*, Rule 3.7, specifies that under certain circumstances lawyers should not act as both advocates and witnesses in the same action. The Rule reads:
 > (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:
 > (1) the testimony relates to an uncontested issue;
 > (2) the testimony relates to the nature and value of legal services rendered in the case; or
 > (3) disqualification of the lawyer would work substantial hardship on the client.
 > (b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by [the conflict of interests rules].

statute of limitations or by Fairfax's unclean hands, or had been released or waived by Fairfax.

Fairfax noted this timely appeal in which it raises ten issues, which, in large measure, can be answered by responding to five questions:

1. Did the trial court err in finding that Fairfax's claim for transactional malpractice was barred by the three-year statute of limitations?
2. Did the trial court err in holding that Fairfax's claim for fraud or constructive fraud growing out of the firm's overbilling was barred by the statute of limitations?
3. Did the trial judge err in finding that the firm had made full disclosure of the billing fraud?
4. Did the trial judge commit reversible error by requiring that Fairfax prove the inadequacies of the firm's disclosure of its billing fraud?
5. Was the trial judge correct in ruling that the conflict created by Weinberg and Green's continued representation of Fairfax in light of the overbilling was waivable and that it had been waived by Fairfax?

## I. *STANDARD OF REVIEW*

 When an action has been tried without a jury, this Court will not set aside the trial court's judgment "on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8–131(c). A finding of a trial court is not clearly erroneous if there is competent, material evidence in the record to support the court's conclusion. *Maxima Corp. v. Cystic Fibrosis Found.*, 81 Md.App. 602, 610, 568 A.2d 1170, *cert. denied sub nom., 6933 Arlington Dev. v. Maxima Corp.*, 319 Md. 582, 573 A.2d 1337 (1990). In reviewing the record, we consider all evidence produced at trial in the light most favorable to the party prevailing below. *Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 41, 382 A.2d 564 (1978); *L & P Converters, Inc. v. Alling & Cory Co.*, 100 Md.App. 563,

569, 642 A.2d 264 (1994). A trial judge's decision "founded upon sound legal principles and based upon factual findings that are not clearly erroneous will not be disturbed in the absence of a showing of a clear abuse of discretion." *Domingues v. Johnson,* 323 Md. 486, 492 n. 2, 593 A.2d 1133 (1991).

## II. *THE RECORD EXTRACT*

The facts relevant to this case are complicated and were developed in a trial that lasted thirty days. The record is voluminous, yet the joint record extract prepared by the parties is relatively sparse. Primarily, both parties present the facts of the case by quoting or paraphrasing the trial court's opinion rather than by making reference to documents or testimony presented to the trial court. We view this as an implicit concession by the parties that as to many of the factual issues in the case the trial judge was justified in her factual conclusions. Therefore, in this opinion we have assumed that the trial judge's factual findings were justified, unless the appellant 1) challenged a factual finding of the trial judge and 2) supported the challenge by a reference to evidence set forth in either the record or the record extract.[2]

---

2. Maryland Rule 8–501(c) states:
> The record extract shall contain all parts of the record that are reasonably necessary for the determination of the questions presented by the appeal and any cross-appeal. . . .

The record in this case is contained in seventeen boxes filled with transcripts and hundreds of exhibits.

We have held that when the record extract "is absolutely devoid of the evidence, oral or physical," necessary for us to rule upon an issue, we may dismiss the appeal as "we are not required to ferret out from the record those materials which counsel should have printed in the abstract." *Eldwick Homes Ass'n, Inc. v. Pitt,* 36 Md.App. 211, 212, 373 A.2d 957 (1977). *See also Davis v. Davis,* 97 Md.App. 1, 24, 627 A.2d 17 (1993), *aff'd,* 335 Md. 699, 646 A.2d 365 (1994) (holding that party waived issue by not including relevant portions of record in extract and by not clearly directing this Court to relevant portions of record). In those instances where appellant has made an argument based on a factual assertion as to what evidence was introduced at trial, we have deemed that assertion waived unless: 1) The assertion is admitted by appellee; 2) the fact or facts are contained in the trial judge's opinion;

### III. BACKGROUND FACTS

The genesis of this appeal came well before Fairfax filed suit against Weinberg and Green in 1992. It began with a loan guarantied by Charles Ellerin, among others, negotiated by the firm for Fairfax in 1982 (hereinafter referred to as either "the Ellerin loan" or "the Ellerin transaction"). Fairfax alleges the firm committed malpractice in preparing the loan documents for the Ellerin transaction. Further, Fairfax alleges, and Weinberg and Green admits, that the firm fraudulently overbilled Fairfax from 1983 to 1987. Finally, Fairfax contends that an unwaivable conflict of interest existed as a result of Weinberg and Green's representation of it during the *Ellerin* litigation in light of the overbilling, and as a consequence, the firm must disgorge all fees it earned in that litigation and reimburse Fairfax for all losses incurred as a result of an adverse *Ellerin* verdict.

### A. The Ellerin Loan and the Resulting *Ellerin* Litigation

In 1982, Charles Ellerin and Louis Seidel, the General Partners of Sherwood Square Associates ("Sherwood"), sought financing for a real estate development project in Westminster, Maryland. Fairfax agreed to lend Sherwood a total of $5,700,000, divided into three separate loans. One was a conventional loan of $850,000, which was paid back prior to the onset of any litigation. The other two loans were evidenced by Industrial Revenue Bonds ("IRB's"), acquired through the City of Westminster, in amounts of $3,050,000 and $1,800,000. Weinberg and Green represented Fairfax in the loan transactions and prepared all documents relating to the loans. A senior partner in the firm's real estate department supervised the preparation of documents with the assistance of David M. Blum and various other Weinberg and Green attorneys.

Fairfax insisted on personal guaranties from the investors in order to protect its investment because the buildings were

---

or 3) appellant makes reference in its brief as to where the evidence can be found in either the joint record extract or the record.

little more than empty shells when the loans were made. Fairfax, of course, took back a mortgage on the property but also insisted on a guaranty from Ellerin and Seidel ("the General Partners"). Moreover, it required that completion guaranties be signed. These completion guaranties imposed personal liability on Charles Ellerin and his wife, Naoma, on Louis Seidel and his wife, Gloria, and on the Tri–Ess Corporation (hereinafter, "the guarantors"). The General Partners and the guarantors were represented in all phases of the loan transaction by R. Bruce Alderman, a Maryland attorney.

The obligations of the guarantors under the completion guaranties (as originally drafted by Weinberg and Green) were to complete the building according to the specifications and to secure additional financing to finish the project if necessary. The liability of the General Partners was set out in two loan agreements, one for each IRB. Fairfax submitted drafts of the loan documents to Alderman on December 22. As originally drafted, neither the General Partners nor the guarantors had any liability after the buildings were completed. Both the Completion Guaranty and the loan agreement were changed by Weinberg and Green prior to their execution. How, why, and under what circumstances these documents were changed was the subject of the litigation that ensued when Sherwood defaulted on the loan. That litigation will be hereafter referred to as the "*Ellerin* litigation" or the "*Ellerin* case." [3]

---

**3.** As noted in *Fairfax Sav., F.S.B. v. Ellerin*, 94 Md.App. 685, 691 n. 3, 619 A.2d 141 (1993), *rev'd in part*, 337 Md. 216, 652 A.2d 1117 (1995), the *Ellerin* litigation involved the trial of several consolidated cases. We said:

> [The Ellerin Litigation] included Fairfax's claims against Ellerin, *et al.*, based on a Completion Guaranty executed in connection with a $3.05 million loan (85–C6–3775) (Guaranty case), Fairfax's claims against Ellerin, *et al.*, based on a Completion Guaranty executed in connection with a $1.8 million loan (85–C6–3776) (Guaranty case), the claims of Ellerin *et al.*, against Fairfax based on the Completion Guaranty (85–C6–4168), Fairfax's claims against Ellerin and Seidel as general partners on the $3.05 million loan Agreement (85–C6–3767) (partner case), and Fairfax's claims against Ellerin and Seidel

The documents prepared by Weinberg and Green and executed at the settlement on December 29 and 30, 1982, provided that neither Sherwood nor the General Partners would be liable for the loans if default occurred "at any time after the termination of the Completion Guaranty (pursuant to Section 8.1 thereof)." Section 8.1 of the new completion guaranties provided that the guarantors' obligations "shall cease and be extinguished ... when the acquisition of the Facility has been completed and when [Sherwood] has fully complied with and satisfied the Rent Roll Requirement." The Rent Roll Requirement, a new addition to the completion guaranties, was defined as the leasing of seventy percent of the finished buildings.[4]

Section 3.1 of the completion guaranties imposed post-completion liability on the guarantors in the event that Sherwood "has not fully complied with and satisfied the Rent Roll Requirement," to an aggregate liability of $1,150,000 on each IRB (a total of $2,300,000). In short, under the terms of the new loan documents, the guarantors continued to have possible personal liability as guarantors (up to a maximum of 2.3 million dollars) beyond the date the project was physically completed until such time as the property was seventy percent leased. The General Partners, under the revised loan docu-

---

as general partners on the $1.08 million Loan Agreement (85–C6–3768) (partner case).

**4.** We explained in *Ellerin v. Fairfax Sav. Ass'n,* 78 Md.App. 92, 97 n. 4, 552 A.2d 918, cert. denied, 316 Md. 210, 557 A.2d 1336 (1989):

> The rent roll formula is somewhat complex, and appears in Art. III, § 3.1(c)(ii) of each "Completion Guaranty." It looks like this:
>
> $$\$1,150,000 \times \frac{70\% \text{ less percentage of total leasable space leased}}{70\%}$$
>
> For example, if the Guarantors had leased seven percent of the total leasable space, their liability would be reduced to $1,035,000.

ments, had potential post-completion liability up to the full amount of the loans.

Blum, who in 1982 was a partner at Weinberg and Green, testified at the trial *sub judice* that he was working on the loan documents on the evening of December 27, 1982, when Jack Stollof, the senior vice president of Fairfax, telephoned and asked what the loan documents provided with respect to the personal liability of the guarantors. When Blum replied that the documents contained no post-completion personal guaranties, Stollof became upset and insisted that this should be changed. Stollof demanded that Blum call Ellerin and Alderman to resolve the "problem" immediately.

According to Blum, he quickly managed to get himself and Stollof and others in telephone contact with Alderman. In a conference call, Stollof informed Alderman that the loans would not go through unless the guarantors agreed to post-completion guaranties.[5] Blum testified that by the end of this conference call, the parties had agreed that the guarantors would have post-completion exposure for $1,150,000 on each IRB loan, subject to the seventy percent Rent Roll Requirement. In the days between the conference call and closing, Blum and other firm attorneys worked on making the changes in the completion guaranty that were agreed to during the conference call.

Blum also made a change to the loan agreement in an effort to "achieve greater clarity." He inserted language into Paragraph 4.1 of the loan agreement that the General Partners' liability would end "after the termination of the completion guaranty." As previously noted, this language extended the General Partners' liability for the entire loan beyond the physical completion of the project through the lease-up period.

---

**5.** Alderman, while testifying during the *Ellerin* trials, denied that the conference call ever took place. Moreover, he steadfastly maintained that no changes in any of the loan documents were pointed out to him by Blum or anyone else prior to their execution. He did not testify in the case *sub judice*. Judge Harrington found that the conference call did take place and that Alderman was fully advised as to the increased exposure of the guarantors. Appellant does not challenge this finding.

This additional language was not agreed to by the parties. According to Blum's testimony, he never intended the language to expand the liability of the General Partners; he intended to expand only the potential liability of the guarantors.

On the day of closing, Blum gave Alderman the opportunity to review the loan documents. Blum testified that he specifically pointed out the changes he had made to the completion guaranty. Thus, according to Blum, Alderman knew that the potential post-completion liability of the guarantors had been increased to 2.1 million dollars. Blum acknowledged, however, that he did not point out the changes he had made in the loan agreement. Thus, according to Blum, the possible post-completion exposure of the General Partners had been increased from zero to well over four million dollars (until seventy percent of the building was leased); yet neither Blum nor Alderman realized this at the time of closing.

In regard to the change in the documents that increased the liability of the General Partners, Judge Harrington commented:

> All experts who testified in this case regarding the standard of care required in communicating changes in transactional documents to the borrowers agreed that [the firm] was required to communicate to the borrowers and their counsel any material changes that were reflected in new drafts of the loan documents....

> \* \* \*

> It is undisputed that Blum did not communicate the material change to Section 4.1 of the Loan Agreement to the borrowers or their counsel. This Court therefore finds this failure breached the standard of care [the firm] owed to Fairfax in handling this loan transaction.

Sherwood defaulted on the loans in 1985, after the buildings were completed but before the Rent Roll Requirement was satisfied. Fairfax retained Weinberg and Green to file suit against the General Partners and the guarantors for their

liability for the debt under the loan documents. Judgments by confession were entered against both the guarantors and the General Partners, but they successfully moved to vacate the confessed judgments on the ground that Fairfax had committed fraud by slipping guaranties into the final loan documents without their knowledge. The guarantors and the General Partners next filed counterclaims against Fairfax alleging, *inter alia,* fraud and seeking punitive damages.

The ensuing *Ellerin* litigation generated three trials and three reported decisions by Maryland appellate courts. Weinberg and Green represented Fairfax in all three of the trials and in the first of two appeals. The first trial began on September 2, 1987 and ended one month later. Counsel for the General Partners and the guarantors argued that a "double-fraud" had been committed by Fairfax in drafting the loan documents. The first (alleged) fraud was the imposition of liability on the guarantors under Section 3.1 of the completion guaranties; the second fraud was Weinberg and Green's failure to disclose the extension of the General Partners' liability under Paragraph 4.1 of the loan agreement.

The jury at the first *Ellerin* trial found that Fairfax had fraudulently changed the loan documents but also found that the guarantors had ratified the fraud. The jury awarded Fairfax damages of $2,303,984.61 against the guarantors. The trial court granted Fairfax's summary judgment motion in the cases filed against the General Partners and entered judgment (jointly and severally) for $5,263,688.75 against them. These judgments were reversed due to erroneous jury instructions on ratification, and the entire matter was remanded for a new trial. *Ellerin v. Fairfax Sav. Ass'n,* 78 Md.App. 92, 552 A.2d 918, *cert. denied,* 316 Md. 210, 557 A.2d 1336 (1989).

The second *Ellerin* trial, which began in September 1990, ended with a hung jury.

The third trial began April 10, 1991. The jury found that neither the guarantors nor the General Partners nor their attorney were aware of the altered provisions in the loan documents. The court directed a verdict in favor of Fairfax

and awarded it $4,371,401.96 in damages against the General Partners (the amount owing on the loans) and $2,984,033.20 against the guarantors. On the fraud counterclaims, the jury returned verdicts against Fairfax of $2,650,695 in compensatory damages for emotional distress and pre-judgment interest, $7,355,435.16 for the damages resulting from Fairfax's judgment against the General Partners and guarantors, and $6,000,000 in punitive damages. This Court upheld the award of compensatory damages but, based on an erroneous jury instruction, vacated the punitive damages award. *Fairfax Sav., F.S.B. v. Ellerin,* 94 Md.App. 685, 619 A.2d 141 (1993). The Court of Appeals granted a petition for certiorari filed by the guarantors and the General Partners. It ultimately agreed, however, that the punitive damages award should be vacated, and remanded for a new trial on the issue of punitive damages only.[6] *Ellerin v. Fairfax Savings, F.S.B.,* 337 Md. 216, 243, 652 A.2d 1117 (1995).

Over a year after the May 1991 jury verdict in the third *Ellerin* trial, Fairfax filed the case *sub judice* against Weinberg and Green.

Despite Judge Harrington's holding that the firm was required to communicate to the borrowers any material changes in the new drafts and that the firm had breached the standard of care it owed to Fairfax in handling the loan transaction, Judge Harrington concluded that Fairfax had failed to prove how this breach caused its damages. She explained:

It is undisputed by witnesses in this case that Alderman was told orally about material changes to the loan documents, yet he testified [in the final *Ellerin* case] to the contrary, and the jury believed him. There is no evidence in the record of this case from which the Court can conclude that had Alderman been orally informed of an additional change in the Loan Agreement, he would have testified differently, or the jury would have disbelieved him. The evidence is

---

**6.** In late September 1995, while this appeal was pending, Fairfax settled the *Ellerin* case just prior to jury selection. The parties agreed to keep the amount of the settlement secret.

that Blum did point out the changes in the Completion Guaranty to Alderman, yet Alderman denied it in his *Elle-rin* testimony. Assuming Blum [had been] able to testify that he also reviewed changes in the Loan Agreements with Alderman, it would have made no difference.

As noted earlier, Judge Harrington also found (in the alternative) that Fairfax's claims based on the alleged malpractice in drafting and documenting the loan transaction were barred by the statute of limitations.

### B. The Overbilling Scheme

Stanford Hess (Hess) joined Weinberg and Green in 1974, became a partner in 1977, and served as a member of the firm's executive committee beginning in 1987. Hess was a close friend of Malcolm Berman (Berman), Fairfax's majority stockholder. In the early 1980's, Hess was the firm's highest biller, with Fairfax and other Berman-related entities making up over half of his billings. Hess, however, grew tired of Berman's practice of delaying fee payment and of negotiating fee reductions before finally paying his bills. In 1983, Hess sporadically began to inflate billable hours on legal work done for Fairfax and numerous other Berman-related entities. Hess, in early 1986, offered a fifteen percent discount to Fairfax and other Berman-related entities on their legal fees; in return, the clients were to make prompt payments of their bills. Berman accepted this offer, and thereafter the bills reflected a fifteen percent discount. The discount was illusory, however, because the firm's bookkeeping staff, at Hess's direction, wrote two computer programs that inflated billable hours by fifteen percent. One program changed the hours only on the billing statement; the other changed the hours on both the pre-bills and the billing statements. This organized, systematic billing fraud practiced against Fairfax and other Berman-related accounts was put in place in February or March 1986 and continued up until May 1987. Members of the firm's administrative staff, computer division, and billing department learned of Hess's fraud. The chair of the firm's finance committee knew of the fraud as early as March 1987,

and the executive committee discussed the problem of Hess's overbilling scheme for several months prior to September 1987. Despite this knowledge, Berman was initially not told of the fraud.

The *Ellerin* litigation was instrumental in finally bringing the fraud to Berman's attention. Fairfax claimed in the *Ellerin* litigation that the defendants were not only responsible for repaying the loan but were also responsible for all legal fees connected with collecting the debt.[7] On September 1, 1987, Judith O'Neill, Weinberg and Green's lead trial attorney in the first *Ellerin* trial, realizing that the fees had been inflated, reported to James Carbine, the head of Weinberg and Green's litigation department, that the firm had fraudulently overbilled Fairfax in the *Ellerin* litigation and in another Berman-related account.

The first *Ellerin* trial began on September 2, 1987, which was the same day that Carbine went to Ronald Creamer, managing partner of Weinberg and Green, and told him of the billing fraud.[8] A fee petition prepared by O'Neill and a fee exhibit summarizing the fees charged by the firm to Fairfax in the *Ellerin* litigation were introduced at trial on September 4, 1987.

Carbine met with Hess on September 8, 1987, and told him that Berman must be notified of the fraud and repaid. Hess initially refused, stating that if Berman were notified it would ruin him (Hess) and the firm. Mr. Carbine was not persuaded to drop the matter. He met with the firm's executive committee on September 8, 1987, and they authorized Carbine to begin an investigation in order to identify the total amount of

7. Some fees incurred (e.g., fees connected with Sherwood's bankruptcy) were apparently not recoverable under the loan documents. Appellant did not include a copy of the loan documents in the joint record extract. *See* n. 4, *supra.*

8. All parties agree that Mr. Carbine had no knowledge of the billing fraud prior to September 1, 1987. Once he gained knowledge of the fraud, Mr. Carbine acted ethically and expeditiously to try to rectify the harm caused to Fairfax and other Berman-related entities.

overbilling to Fairfax and other Berman-related entities so that the clients could be fully reimbursed.

On Sunday, September 13, 1987, a delegation of attorneys from the firm, including Hess but not Carbine, met with Berman at his home to reveal the overbilling. Because defense counsel had subpoenaed the back-up billing documents for their fee petition, Weinberg and Green feared that the defendants in the *Ellerin* case would discover the overbilling. Therefore, it was necessary to tell Berman of the immediate need to withdraw the fee petition in the *Ellerin* case. This began a long process of research on Weinberg and Green's part as to the amount that the client had overpaid, disclosures by the firm, execution of releases by Berman, and repayment by the firm.

The fee petition in the *Ellerin* litigation was withdrawn on September 14, 1987, with Berman's consent. Berman met with firm attorneys at some point prior to December 31, 1987 (the trial court was unable to determine the exact date) and was presented with disclosure documents regarding the firm's systematic overbilling scheme. Weinberg and Green had concluded at this point, following an investigation by Carbine, that Fairfax and other Berman-related entities were due a refund of $110,599 for overbilling on accounts other than Ellerin for the period between October 1983 [9] and August 1987.[10] The firm also concluded that Fairfax was due a payment of $275,-000 for the withdrawn fee petition in *Ellerin,* based on what the firm estimated would have been recovered at trial (from the General Partners and the guarantors) if the fee petition had not been withdrawn. Finally, the firm proposed a $90,000 payment for withdrawal of a fee petition in the *"Zurich"*

---

9. In determining the amount the firm should repay, the firm gave a 15 percent discount on bills from October 1983, even though all bills were not inflated at that point and even though Hess did not offer Berman the 15 percent discount until 1986.

10. Hess's overbilling of Berman-related accounts ceased in May 1987, but to make sure that all amounts due were repaid, the firm used the August 1987 date.

litigation. That litigation involved a suit by a Berman-related entity (not Fairfax) against the Zurich insurance company.

Oddly, Berman was delighted by the discovery of the over-billing scheme, at least according to Arnold Weiner, a Maryland attorney who represented Fairfax in other matters. A few weeks after September 13, 1987, Berman told Weiner about the firm's scheme and viewed the situation as humorous. Berman was pleased the firm had overbilled him because it created an opportunity for him to recover a substantial amount of money [11] and proved that the firm had "outsmarted" itself. Showing himself as a person who would not hold a grudge, at least as long as the firm obtained good results, Berman continued to use the firm in over one hundred other cases after the overbilling fraud was disclosed. Berman also continued his friendship with Hess and even asked the firm not to impose in-house sanctions on Hess for his part in the fraud.[12] In December 1987, the firm proposed that Fairfax sign a release of the firm's liability caused by the withdrawal of the fee petition in the *Ellerin* trial. With regard to the signing of the release, Berman was advised repeatedly that he had the right to consult with independent counsel, and he was encouraged to do so. This advice was communicated orally. The firm did not, however, advise Berman in writing to seek independent counsel regarding the releases.[13]

---

**11.** In his trial testimony, Weiner placed this conversation at some time between September 18, 1987, and the weeks immediately following.

**12.** Hess remained on the firm's executive committee until 1990 and with the firm until he was finally asked to leave in 1994. The firm never sanctioned Hess.

**13.** *Maryland Rules of Professional Conduct,* Rule 1.8(h), reads:

> A lawyer shall not make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless permitted by law and the client is independently represented in making the agreement, or settle a claim for such liability with an unrepresented client or former client without first advising that person in writing that independent representation is appropriate in connection therewith.

Judge Harrington found "that Weinberg & Green's technical violation of Rule 1.8(h) did not affect the legal validity of the release."

Drafts of the proposed release went back and forth between the parties. Ultimately, the firm presented two releases to Berman in January 1988. The first released the firm from all claims that Fairfax may have had against it as a result of the withdrawn fee petition in the *Ellerin* litigation.[14] As consideration, the firm paid Fairfax $265,000.[15] The second released the firm from all claims that Fairfax may have had against it for any negligence in connection with its work on the Ellerin loans. The firm paid Fairfax $10,000 for the second release.[16] Berman agreed to sign both releases, but he wanted the

---

**14.** Under the terms of the release, Fairfax could not sue the firm for any additional fees that might have been incurred in the *Ellerin* litigation after the release was signed. The release read, in pertinent part:

Fairfax Savings Association ... hereby does remise, release and forever discharge Weinberg and Green ... from any and all claims, actions, suits, debts, accounts, covenants, contracts, controversies, damages, judgments, and demands of whatsoever kind or nature, the said Fairfax Savings Association ever had [or] now has ... up to and through the date of this Release, for, upon, or by reason of any matter, cause or thing pertaining to or in any manner relating to the payment of legal fees and/or related costs incurred by Fairfax Savings Association in connection with Fairfax Savings Association's involvement in [the *Ellerin* loans], including without limitation such legal fees and/or related costs subject to claims and demands made by or on behalf of Fairfax Savings Association[ ] in the [*"Ellerin* litigation"].

(Emphasis added.)

This release is analogous to the one at issue in *Bolling Federal Credit Union v. Cumis Ins. Society*, 475 A.2d 382 (D.C.1984), where the Court held that, because the release covered all claims "which Bolling 'has or may have' as of the execution date, the release covered all losses of which Bolling had knowledge, as well as those which existed but were not yet identified, at the time the release was signed." *Id.* at 385. Thus, though Bolling did not know the extent of its losses when it signed the release, it was held to have released every claim it had at the time it signed the release, including the additional twenty-four claims at issue. *Id.* at 386. One of the claims Fairfax had, as of the date of the release, was a claim for all fees it could have collected from the *Ellerin* defendants if it won the *Ellerin* case. By its release, Fairfax gave up that claim.

**15.** At the time the release was signed in January 1988, the firm had already re-paid $98,000. The remaining $167,000 was paid in monthly amounts of $18,000 beginning April 1988.

**16.** This $10,000 was the balance of the $275,000 the firm had agreed to repay Fairfax for the withdrawn *Ellerin* fee petition. It was inserted so that the second release would be supported by consideration.

$10,000 release to specify that the firm would continue to represent Fairfax in the *Ellerin* litigation, including any retrial if one were ordered. Thus, an early draft of this release included this promise. This promise was later deleted from the release, but it was reiterated in a separate letter (dated January 1988) in which the firm stated it would continue to represent Fairfax

> provided that (1) any necessary waiver-of-conflict letter and/or release is executed on behalf of Fairfax Savings; (2) neither Weinberg and Green nor any of its partners or employees are made parties in [the *Ellerin* case]; and (3) Weinberg and Green is not otherwise disqualified from representation.

This letter also stated that Berman had been advised that the firm's continued representation of Fairfax "may not be in Fairfax Savings' best interests." Both releases were signed on January 25, 1988. Thus, the parties contemplated the possibility of continued litigation even though the releases were signed approximately one year before the judgment in the first *Ellerin* trial was reversed by this Court.

About the time the releases were signed, the firm paid Fairfax $110,599 in compensation for the firm's overcharging of Fairfax and numerous other Berman-related accounts. No release was signed in exchange for the $110,599, but as the trial court found, Berman was satisfied with the amount and was pleased that the matter had been resolved.

### C. Malcolm C. Berman

Berman, at all times here relevant, was the Chief Executive Officer and Chairman of the Board of Fairfax. He also owned seventy percent of Fairfax's stock. In Judge Harrington's words, Berman is "the physical embodiment of Fairfax," an enterprise with assets of $440,000,000 and 225 employees. In order to decide many of the issues presented in this case, it was necessary for the trial judge to make an assessment of Berman's credibility. When the assessment was completed, Berman fared badly.

Berman testified that: 1) his higher education amounted to less than six months of accounting classes; 2) he had little contact with lawyers outside of Weinberg and Green during the period when the firm represented him; 3) he had a reading disability and, therefore, did not understand many documents that he signed; 4) he did not personally understand the consequences of his signing releases in this case; instead, he relied on the deceitful explanations of Hess; 5) he needed help in writing letters; 6) when he accepted the $110,599 from the firm, he understood that Weinberg and Green was giving him a "gift" of the money; and 7) he played no active role in the *Ellerin* litigation. In general, Berman attempted to convince Judge Harrington that his decisions relevant to his dealing with Weinberg and Green were uninformed, were the subject of undue influence by Hess, or were flawed because of his legal naivete and reading problems.

A very different picture of Berman emerged from evidence produced by the firm, viz: 1) Berman had testified in another case that his education included "several years of accounting" classes; 2) Berman, as a "savvy" businessman, had hired "legions" of lawyers both before and during the period when he employed Weinberg and Green; 3) he had reviewed and understood many complicated legal documents in the past, often making changes before signing them; 4) he frequently wrote letters on his own and revised those written by others; 5) he referred to himself as the best lawyer he knew; 6) he understood that a $110,599 payment from the firm was in settlement of the claim for the overbilling fraud; 7) he was present for opening statements and other parts of the first *Ellerin* trial, met repeatedly with Weinberg and Green attorneys to go over *Ellerin* trial strategy, and checked in with firm attorneys every day during the second *Ellerin* trial; and 8) he "micro-managed" litigation in which he was involved. Attorneys testified that working for Berman was like working with a supervisory attorney. Moreover, Weinberg and Green proved that in an unrelated arbitration proceeding Berman demonstrated his familiarity with legal proceedings by passing notes to his attorney and suggesting cross-examination ques-

tions. Further, Berman had no problem in reading the English language as demonstrated by the fact that he had taken and passed written examinations to obtain pilot's, insurance, and real estate broker's licenses.

Judge Harrington believed that Berman was a "highly successful, clever and tenacious" businessman with an admitted net worth of at least sixty million dollars. In addition to running Fairfax, Berman oversaw the operation of numerous other successful businesses, including the Princess Royale hotel in Ocean City, Maryland, which "was built by Berman at the cost of $38 million. Berman acted as general contractor, negotiating every contract and personally supervising all details of the construction."

The court concluded that Berman "attempted to paint an untrue picture of his background and education, sophistication, knowledge of legal claims and procedures, ability to negotiate or revise contracts and his care with significant documents." Berman attempted to make himself look like an unsophisticated victim of Weinberg and Green instead of the legally savvy businessman that he truly was. Judge Harrington found that Berman intentionally testified falsely about many issues in the case. As a consequence, she gave his testimony no discernable weight. Appellant does not challenge any of these credibility findings.

### D. Fairfax's Original and Amended Complaints

Fairfax alleged in its original complaint that: 1) it was entitled to indemnification for the judgment entered against it in the third *Ellerin* trial; 2) the firm had committed malpractice in writing the loan documents and in its representation of Fairfax during the three *Ellerin* trials; and 3) the firm had breached its fiduciary duty to Fairfax. The original complaint does not mention the overbilling or any conflicts connected to it.

On June 20, 1994, which was more than three years after the verdict in the third *Ellerin* trial, Fairfax filed its second

amended complaint. It added a fraud count based on the firm's overbilling, which stated:

111. Over a period of years, W & G submitted bills for professional services to Fairfax which W & G knew purposely and systematically overstated the amounts due to W & G for its professional services.

112. W & G knew that the bills were false when they were submitted to Fairfax for payment. W & G submitted the false bills to Fairfax for the purpose of defrauding Fairfax.

113. Fairfax justifiably relied upon the accuracy of the false bills, and suffered actual damages as a direct result of its justifiable reliance.

114. W & G's Billing Fraud Scheme and its fabrication of false self-serving evidence to justify its actions constituted gross fraud, was perpetrated with malice and willfulness, and was a gross breach of W & G's fiduciary duties to Fairfax.

The count alleging malpractice based on conflicts of interest stated that the firm's representation of Fairfax during the *Ellerin* trials was materially limited and adversely affected by the firm's

interest in protecting itself from, or minimizing the consequences of, having to disclose to independent counsel for Fairfax W & G's Billing Fraud Scheme [and the firm's] interest in protecting itself from, or minimizing the consequences of, having to disclose to the Attorney Grievance Commission of Maryland, and the public at large, its Billing Fraud Scheme[.]

Another count contained an allegation that proceeding to represent Fairfax in light of the firm's conflicts of interests was a breach of the firm's fiduciary duties.

## E. The Court's Rulings as to the Statute of Limitations

Judge Harrington found that prior to December 31, 1987; 1) the firm had fully and fairly disclosed to Fairfax the details of the overbilling scheme by December 31, 1987; 2) Berman

received documents setting forth the firm's estimated overbilling; 3) Berman met with firm attorneys to discuss the overbilling and its implications; 4) Berman was advised that the firm had used a systematic, computerized scheme to accomplish the overbilling; and 5) Berman knew how long the scheme had lasted and which accounts had been overbilled. The court also found that Berman was told to seek the advice of independent counsel before agreeing to settle his claim for overbilling and that Berman signed a release for the withdrawn *Ellerin* fee petition at a point when he was fully apprised of all the information he needed regarding the overbilling. Lastly, Judge Harrington found that Fairfax's delay of more than six years after receiving full disclosure of the billing fraud barred any cause of action based on that fraud. Likewise, the statute of limitations barred Fairfax's cause of action for transactional malpractice (Count II) and for an accounting (Count IX).

Additional facts will be set forth as necessary to address the issues presented.

## IV. *ANALYSIS*

### Issue 1. Did the statute of limitations bar Fairfax's claim for transactional malpractice?

 Ordinarily, a cause of action must be filed within three years from the date it accrues. Md.Code Ann., Cts. & Jud.Proc. § 5–101 (1974, 1975 Repl.Vol.).[17] "[T]he purposes of statutes of limitation are to provide adequate time for a diligent plaintiff to bring suit as well as to ensure fairness to defendants by encouraging prompt filing of claims." *Hecht v. Resolution Trust Corp.*, 333 Md. 324, 338, 635 A.2d 394 (1994). In actions involving malpractice, where a wrong is often not discoverable until long after it is committed, "the cause of action accrues when the wrong is discovered or when with due

---

17. Hereinafter, all statutory references shall be to the Courts and Judicial Proceedings Article, unless otherwise specified.

diligence it should have been discovered." *Leonhart v. Atkinson,* 265 Md. 219, 289 A.2d 1 (1972). *See also Mumford v. Staton, Whaley & Price,* 254 Md. 697, 255 A.2d 359 (1969); *Hahn v. Claybrook,* 130 Md. 179, 100 A. 83 (1917).

> [T]he discovery rule contemplates actual knowledge—that is express cognition, or awareness implied from
>> knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus, charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.... In other words, a [person] cannot fail to investigate when the propriety of the investigation is naturally suggested by circumstances known to him; and if he neglects to make such inquiry, he ... must suffer from his neglect.

*Poffenberger v. Risser,* 290 Md. 631, 637, 431 A.2d 677 (1981) (quoting *Blondell v. Turover,* 195 Md. 251, 257, 72 A.2d 697 (1950)).

A cause of action does not accrue, however, until all elements are present, including damages. *Baker, Watts & Co. v. Miles & Stockbridge,* 95 Md.App. 145, 187, 620 A.2d 356 (1993). Accrual occurs when some evidence of legal harm has been shown, even if the precise amount of damages is not known, *American Home Assurance v. Osbourn,* 47 Md.App. 73, 86, 422 A.2d 8 (1980), *cert. denied,* 289 Md. 739 (1981), and even if plaintiff has suffered only "trivial injuries." *Mattingly v. Hopkins,* 254 Md. 88, 95, 253 A.2d 904 (1969). *See also Feldman v. Granger,* 255 Md. 288, 296, 257 A.2d 421 (1969) (ignorance as to the exact amount of damages sustained at discovery of wrong "is not a sufficiently sound reason to postpone the accrual of the action or toll the running of limitations"). The dispositive issue in determining when limitations begin to run is when the plaintiff was put on notice that he may have been injured. *Russo v. Ascher,* 76 Md.App. 465, 470, 545 A.2d 714 (1988).

The parties and the trial judge refer to the negligence of the firm in preparing the Sherwood loan documents and in

failing to notify the attorney for the General Partners of changes that were made in the documents as "transactional" malpractice. The court found that Fairfax learned of its potential transactional malpractice claim in September 1987 and that the firm thereafter "engaged in [no] conduct that would toll the statute of limitations." Fairfax does not challenge these findings. Instead, it contends that its cause of action for transactional malpractice did not accrue until it suffered damages and that it suffered no damages until May 1991 when the jury in the third *Ellerin* trial returned its verdict.

On January 2, 1987, the Circuit Court for Baltimore County set aside the confessed judgments previously entered against the General Partners and guarantors. The sole basis for setting aside the confessed judgments was because Weinberg and Green had (allegedly) altered the loan document and increased the potential exposure of the defendants without notifying them. Setting aside the confessed judgment changed a routine collection case into one in which Fairfax was forced to defend against a counter-claim alleging fraud; this, in turn, caused Fairfax to incur huge additional attorneys' fees.[18] A portion of those additional fees was incurred by the

---

**18.** That Berman knew by September 1987 that Weinberg & Green's actions may have caused Fairfax substantial damage is shown by a memo dated September 21, 1987, from James Carbine to Herbert Hubbard, the firm's liaison with its insurance carrier. The memo reads, in pertinent part:

> During the course of this trial we have been put on notice by our client, Malcolm Berman, that David M. Blum when he was still a member of this Firm inadequately documented the original loan closing. The failure to so document, according to Mr. Berman, permitted circumstances to exist which allowed the defendants the pretext for the fraud claim. *Our client asserts that had not David Blum acted negligently in putting together the 1982 loan closing Fairfax's litigation expenses would have been a fraction of what they are and would have been limited to those of a straightforward collection action.* Further our client asserts that in the event of an unfavorable outcome at trial Weinberg and Green is liable to Fairfax for the whole $5.5 million as a result of Blum's negligence in documenting the loan closing.

(Emphasis added.)

end of the first *Ellerin* trial in November of 1987. Appellant waited more than three years after incurring additional attorneys' fees before filing suit for the transactional malpractice.

██ Ordinarily, incurring the expense of hiring counsel is not enough to constitute "legal harm" for purposes of the discovery rule. *American Home Assurance, supra,* 47 Md. App. at 87, 422 A.2d 8. There is, however, an exception to that rule, i.e., if the cost of defending a suit is the direct result of a lawyer's malpractice, the legal harm element is satisfied once such legal costs are incurred. The appellee in the *American Home* case was Robert Osbourn, a tow-truck operator. He was asked by the police to tow eight cars from a parking lot. The owners of the eight towed vehicles sued Osbourn for trespass and conversion (the "Colby suit"). Osbourn, who was insured by American Home, asked his insurer to defend him. The insurer refused because of an "intentional acts" exclusion in the policy. *Id.* at 76, 422 A.2d 8. Osbourn hired his own lawyer and ultimately settled the Colby suit. More than three years after he was advised that his insurer refused to provide a defense, Osbourn brought two lawsuits. The first was a declaratory judgment action against his insurer seeking, *inter alia,* a declaration that the insurer should have defended the Colby suit; a second action was brought against Osbourn's insurance broker (Hay Brothers), in which Osbourn alleged negligence and breach of warranty due to the broker's failure to procure adequate insurance coverage for Osbourn. *Id.* The two cases were consolidated for trial, but prior to trial the court granted the broker's motion for summary judgment based on the statute of limitations. The trial judge ruled against American Home, however, and held that the insurer did have a duty to defend. A judgment was entered in favor of Osbourn against the insurer for, *inter alia,* the costs of defending the Colby suit. *Id.* at 77, 422 A.2d 8.

After reversing the judgment entered against the insurer, we turned our attention to the issue of whether the trial judge

erred when he granted summary judgment in favor of the broker and resolved that issue as follows:

The critical question, then, is the date when Osbourn knew or should have known that his insurance broker sold him an insurance policy which was inadequate because it afforded incomplete coverage. Under the discovery rule, plaintiff would have three years from that time in which to file suit. Here, the appellant would have us rule that no damages were incurred in the defense of the Colby suit until the case was settled in December 1977 and, therefore, his cause of action did not "accrue" at least until that time. Osbourn also argues that the pendency of the declaratory judgment action against American Home postponed the running of the statute because he could not know whether his policy provided coverage in the Colby suit until the declaratory judgment case was decided. The appellee, on the other hand, argues that the cause of action accrued on September 11, 1974, the date of American Home's letter to Osbourn stating there was no coverage and declining to provide a defense.

Contrary to appellant's contention, a showing of the precise amount of damages at the time of discovery of the wrong is not required although, of course, there must be some evidence of legal harm. In *Feldman v. Granger*, 255 Md. 288, 257 A.2d 421 (1969), Judge Finan stated for the Court of Appeals:

"[A]s in the *Mattingly* case, and as in other tort cases, the exact amount of damages sustained may not be known at the time of the discovery of the wrong. However, in our opinion this is not a sufficiently sound reason to postpone the accrual of the action or toll the running of limitations when other reasons grounded in public policy are considered."

*Id.* at 296, 422 A.2d 8. *See Mattingly v. Hopkins, supra.* In our view, the statute of limitations in this case began to run on September 11, 1974—the day Osbourn discovered that American Home would not defend. Osbourn knew then that he had to engage his own counsel in the Colby

suit. *We recognize that incurring the expense of counsel fees does not ordinarily constitute sufficient legal harm, in and of itself, to satisfy the "damage" requirement of the discovery rule. In the instant case, however, the cost of defending the Colby suit was a direct result of Hay Brothers' alleged malpractice in failing to procure adequate insurance coverage, one benefit of which would have been complete legal representation of Osbourn.*

The effect of the declaratory judgment action on the application of the discovery rule need not detain us. Suffice to say, appellant could have filed his action against Hay Brothers within the requisite three year time period and the action could have been stayed pending the outcome of the declaratory judgment suit. *See Feldman v. Granger, supra,* 255 Md. at 294–95, 257 A.2d 421.

(Emphasis added.)

 The exception to the rule as set forth in *American Home, supra,* is here applicable. The cost of defending against the *Ellerin* fraud claim was directly attributable to the firm's transactional malpractice. Therefore, the cause of action for that malpractice accrued in 1987 when Fairfax first gained knowledge of its claim and first incurred legal fees caused by the malpractice. The trial judge was correct in holding that the statute of limitations barred Fairfax's transactional malpractice claim.[19]

## Issue 2. Did the trial court err in holding that Fairfax's claim for fraud or constructive fraud[20] grow-

---

**19.** Weinberg and Green argues in its brief that, even if limitations did not bar Fairfax's transactional malpractice claim, the claim was barred by Fairfax's failure to prove damages. We agree with this argument and the trial court's reasoning (set forth *supra*) that supports it.

**20.** In *Ellerin, supra,* 337 Md. at 236 n. 11, 652 A.2d 1117, constructive fraud was defined as:

[A] breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud.

**ing out of the firm's overbilling was barred by the statute of limitations?**

Section 5–101 provides:

**Three-year limitation in general.**

A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced.

Section 5–203 states:

**Ignorance of cause of action induced by fraud.**

If the knowledge of a cause of action is kept from a party by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered.

■■ Mr. Berman testified in the lower court that at the time he signed the two releases (January 25, 1989) he knew Fairfax had been fraudulently overbilled by Weinberg and Green in the amount of $20,000. He further testified that when he signed the release of all claims for transactional malpractice for a total of $10,000, he thought he was signing a release for Fairfax's $20,000 overbilling claim and that the check Fairfax received for $110,599 was a favor or gift from the firm. Not surprisingly, the trial judge did not believe Berman's testimony. The trial judge believed that, due to the overbilling fraud, Fairfax made three payments to Fairfax and/or other Berman-related entities. In December 1987, $90,000 was paid to Berman and Richard Singer, who was Berman's partner in an entity known as Ocean Plaza Joint Venture.[21] This money was paid to the two general partners in the joint venture because the firm had overbilled the joint venture for handling a case against the Zurich Insurance Company ("the *Zurich* litigation"), and as a consequence, a fee petition in that case had to be withdrawn. Whether the firm

---

21. Fifty percent of the joint venture was owned by Fairfax Properties Corporation and fifty percent by Ocean Plaza Shopping Association of which Richard Singer was a general partner.

made full disclosure to the joint venture is irrelevant here because the joint venture in the *Zurich* litigation was not a plaintiff in the case *sub judice.* In January 1987, $265,000 was paid to Fairfax for withdrawal of the fee petition in the *Ellerin* case, and $110,599 was paid to Fairfax for overbilling in nineteen Berman-related accounts, including the Fairfax account. The trial court found that the $110,599 sum paid to Fairfax more than fully compensated it for the losses Fairfax had suffered. In regard to this last finding, the court, in part, relied on the opinion of an expert. The court stated:

> Herbert Walter ("Walter"), a partner in the Dispute Analysis and Corporate Recovery Services Group of the firm Price Waterhouse, testified for Defendant. Walter, a certified fraud examiner, conducted an audit of the bills and prebills using 98% of the pertinent documentation. He testified that in his expert opinion Fairfax was more than fully compensated by the payment of $110,599 on the general accounts for several reasons
>
> 1. The payment included approximately $7,000 more than Walter's audit showed was due Fairfax under a 15% discount methodology;
> 2. Fairfax received the entire amount, even though non-Fairfax Berman-related entities were included in the calculation;
> 3. Calculating the reimbursement globally worked to Fairfax's advantage;
> 4. He found no evidence that expenses or costs billed by W & G to Fairfax were increased;
> 5. The methodology used by the defendant was reasonable.
>
> Walter's testimony was not challenged by any opposing expert and is persuasive on this issue.

Fairfax could not plausibly maintain the court was clearly erroneous in finding that by December 31, 1987, Fairfax had discovered the billing fraud or that Fairfax knew in 1987 that the firm paid it $110,599 for the overbilling. Instead, Fairfax contends that the firm withheld from it knowledge of the full

magnitude of the overbilling fraud until October 1993, when Berman received in discovery plaintiff's Exhibit 131, which was a document that Fairfax reads as showing that it had been overbilled by $270,451, not $110,599. Although Fairfax's brief is in no way clear on this, it apparently claims that it had a cause of action for billing fraud for the difference between what was disclosed and what was not, i.e., a claim for ($270,451, less $110,599) $169,852. In regard to plaintiff's Exhibit 131, the trial court found:

> According to Plaintiff, Exhibit 131 shows overbilling on nineteen separate files over a four-year span and can be read to show an amount overbilled in cases other than *Ellerin* exceeding $270,000. Since Miller had these documents prior to his November 23, 1987 meeting with Berman, and did not show them or provide a copy, Plaintiff contends that Plaintiff's Exhibit 131 is proof that full, material disclosure of fraud was not made.
>
> The [c]ourt has considered [p]laintiff's argument but rejects the premise that this specific information had to be provided for there to be full material disclosure. *Furthermore, the Exhibit does not prove overbilling in the amount suggested by [p]laintiff.*

(Emphasis added.)

This last sentence, which we have emphasized, was supported by substantial evidence. It is true that on plaintiff's Exhibit 131 there is a column with the heading "Write Ups" under which there are a series of figures that total $270,451. For the most part,[22] the term "write ups" can be interpreted as a synonym for "fraudulent overbilling" but many of the write ups concerned bills to entities other than Fairfax and include overbilling in both the *Zurich* and *Ellerin* cases—for which Fairfax was reimbursed separately.[23] More important, Fairfax and the other Berman-related entities had a claim against Weinberg and Green only for monies that it had

---

**22.** Apparently there were some legitimate adjustments to the prebills.

**23.** Fairfax, of course, has a cause of action for fraud practiced against it—not fraud practiced against Berman-related entities.

*overpaid,* not what was overbilled. Plaintiff's Exhibit 131 shows that substantial amounts of monies billed to Fairfax and other Berman-related accounts were never paid. This was also plainly shown on documents that Berman received before Fairfax accepted the $110,599 settlement check.

According to the expert testimony of Herbert Walter, for every one hundred dollars the firm billed Fairfax and other Berman-related entities, it collected only $89.28 (89.28 percent). Because the firm's realization rate was 89.28 percent, Fairfax had, in effect, given itself a discount. Under the agreement between Hess and Fairfax, the firm should have had an eighty-five percent realization rate. Hence, according to the uncontradicted testimony of Walter, Fairfax was due back 4.2 percent of the bill, not fifteen percent. Walter used this 4.2 percent formula on all of the firm's bills to Fairfax or other Berman-related entities between October 1983 and August 1988, with the exception of bills for the *Ellerin* and *Zurich* litigation.

Mr. Carbine explained to the trial court the distinction between overbilling and overpayment. He also explained his methodology in arriving at the $110,599 figure. Judge Harrington summarized Carbine's testimony:

> Once into the project, Carbine realized from the number of accounts and voluminous records involved that it was impossible to differentiate legitimate adjustments to the prebills from illegitimate adjustments. Consequently, the amount of overbilling could not be determined to the penny. Carbine devised a methodology he believed would overcompensate Fairfax by moving an across-the-board discount to the earliest relevant point in time in accounts other than *Ellerin* and *Zurich,* thereby capturing everything and more that Berman would be entitled to. Although the overbilling ended in May, 1987, Carbine continued his calculations through August for audit purposes. All files for nineteen Berman-related accounts, including Fairfax, were examined from the date that the files were opened.

> Recognizing that the formula wouldn't replicate events that occurred, Carbine's intent was to accomplish payback

on a logical, reasonable basis. His formula analyzed nineteen Berman-related entities, setting as a baseline the fees charged at standard rate. The total amount was compared to the fees actually paid by the nineteen entities. A percentage realization[24] rate was then compared to the total Defendant would have received had a fifteen percent discount been in place. The difference between the two amounts was refunded to Fairfax [i.e., $110,599].

Judge Harrington believed Mr. Carbine's testimony and that of the Price Waterhouse expert. She also believed with substantial evidentiary support that this methodology used by Carbine overpaid Fairfax for the billing fraud. Moreover, the trial judge believed that Berman received numerous disclosure documents prior to signing the release. These documents, together with Berman's handwritten notes on one of them, show how the firm arrived at the $110,599 figure, that Berman understood the methodology used in arriving at the figure, and that Berman agreed to it.

In its brief, appellant's only argument as to why the statute of limitations did not bar its claims based on billing fraud is:

In reaching its conclusion that Fairfax's claims of fraud and constructive fraud were barred by the statute of limitations, the trial court relied entirely on its erroneous findings that W & G "made full disclosure of material details of the overbilling," and that W & G "did not engage in any conduct which caused Plaintiff to forebear taking action or otherwise sleep on its rights." As demonstrated above, these findings constituted reversible error. W & G's limitations defenses therefore fail.

(References to footnotes and record extract omitted.)

 In *Finch v. Hughes Aircraft Co.,* 57 Md.App. 190, 241–42, 469 A.2d 867, *cert. denied,* 300 Md. 88, 475 A.2d 1200,

---

**24.** In the disclosure documents given to Berman in 1987, the firm calculated an 89.91 percent realization rate on all monies billed. Mr. Walter used 89.28 percent figure. Use of the 89.91 percent figure benefited Fairfax.

*recons. denied,* 301 Md. 41, 481 A.2d 801 (1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1190, 84 L.Ed.2d 336, *reh'g denied,* 471 U.S. 1049, 105 S.Ct. 2043, 85 L.Ed.2d 341 (1985), we said:

> [T]he burden is on Plaintiffs to prove that they did not discover the alleged wrong more than three years before they filed suit and that this lack of discovery was not due to Plaintiffs' unreasonable failure to exercise ordinary diligence. A plaintiff who invokes Section 5–203 of the Courts and Judicial Proceedings Article must "show affirmatively that he was kept in ignorance of his right of action by the fraud" of defendant, *Mettee v. Boone,* 251 Md. 332, 339, 247 A.2d 390 (1968), and "must specifically allege and prove when and how his knowledge of the fraud was obtained, so that the court will be enabled to determine whether he exercised reasonable diligence to ascertain the facts." *Piper v. Jenkins,* 207 Md. 308, 319, 113 A.2d 919 (1955). In cases where the "discovery rule" may be applicable, plaintiff also has the burden of proving the applicability of the rule since, ordinarily, defendant will have no personal knowledge of when plaintiff discovered, or should reasonably have discovered, the facts upon which his cause of action is based, and plaintiff will know what facts were known to him at any given period in time and what action he took to protect his rights. *See DeWitt v. United States,* 593 F.2d 276 (9th Cir., 1979); *Burgon v. Kaiser Foundation Hospitals,* 93 Cal. App.3d 813, 155 Cal.Rptr. 763 (1979); *Franklin v. Albert,* 381 Mass. 611, 411 N.E.2d 458 (1980).

(Footnotes omitted.)

Fairfax did not meet its burden as set forth in *Finch, supra.* The trial judge found that Fairfax knew by December 31, 1987, the full magnitude of the overbilling fraud and also knew that the fraud was systematic. The trial judge was not clearly erroneous when she made those findings. *See* discussion of Issue 3, *infra.* Fairfax waited more than six years thereafter to file suit. The tolling provisions of section 5–203 were inapplicable because Fairfax failed to prove that (after the full magnitude of the fraud was revealed) any subsequent fraud kept it from filing suit. For these reasons, the trial judge did

not err in finding that Fairfax's claim for fraud or constructive fraud was barred by the statute of limitations.

**Issue 3. Did the trial judge err in finding that the firm had made full disclosure of its billing fraud?**

Appellant argues that the firm did not make a full and fair disclosure of all the facts relevant to the billing fraud and therefore Fairfax did not validly waive the firm's conflict of interest created by that fraud. Part of that argument is based on the contention that Fairfax was not advised as to the magnitude of the fraud. This issue has already been addressed in answer to Issue 2, *supra.* In addition, Fairfax contends that Weinberg and Green should have advised it that the firm had a duty to return to it (disgorge) 2.6 million dollars in fees it received during the overbilling period. Unfortunately for Fairfax, however, no reported Maryland case has held that there is any such duty. Moreover, one federal district court case, interpreting Maryland law, has held to the contrary, i.e., that disgorgement is not required when an attorney fraudulently overbills a client. *Dresser Industries, Inc. v. Digges et al.,* No. JH–89–485, 1989 WL 139234, at *7–8 (D.Md. Aug. 30, 1989) (mem.). Fairfax relies on three Maryland cases in support of its disgorgement theory, viz: *McGinnis v. Rogers,* 262 Md. 710, 732, 279 A.2d 459 (1971); *Sellner v. Moore,* 251 Md. 391, 399, 247 A.2d 523 (1968); *Homa v. Friendly Mobile Manor, Inc.,* 93 Md.App. 337, 352, 612 A.2d 322 (1992), *appeal dismissed,* 330 Md. 318, 624 A.2d 490 (1993).

In the *McGinnis* case, Raphael Urciolo, a lawyer unlicensed in Maryland, headed a real estate firm that was also unlicensed in this state. *McGinnis, supra,* 262 Md. at 730, 279 A.2d 459. Urciolo undertook to represent John Rogers in the sale of Rogers's Maryland property and ultimately received approximately $29,000 in commissions for the sale of Rogers's land. *Id.* Urciolo represented both the buyer and seller at the sale of the property "without divulging his dual role to either." *Id.* The trial court found that the commission charge was a "sham and guise" whereby "an unsuspecting and trusting old man [Rogers] was ... deprived of his life's

labors." *Id.* The Court held that Urciolo should forfeit his commission, explaining:

[U]nless there is a full disclosure by the agent, trustee, or attorney of his activity and interest in the transaction to the party he represents and the obtaining of the consent of the party represented, the party serving in the fiduciary capacity cannot receive any profit or emolument from the transaction. This is true even when the transaction benefits the principal or client, which does not readily appear to be the case in this transaction.

*Id.* at 733, 279 A.2d 459 (citations omitted).

*Sellner, supra,* also involved an old man who was victimized by his agent. Moore, a real estate broker, presented his client (William Sellner) with a proposed contract whereby A.R. Minchew (Minchew) agreed to buy Sellner's land for $650,000. Minchew, a builder, was well known to Moore because he sold houses for him. *Id.* at 393, 247 A.2d 523. The sales contract was a two-page document, not in conventional form that was written by Moore and typed by Moore's secretary. It contained several provisions that were very unfavorable to Sellner, including one allowing Minchew eighteen months to settle. Under the sales contract, Minchew was required to give Moore a $5,000 check as a deposit. The deposit was to be held by Moore until settlement, at which time Minchew was to pay an additional $163,750, with Sellner taking back a first trust for the balance. *Id.* at 396, 247 A.2d 523. Unbeknownst to Sellner, Moore allowed Minchew to put up only $2,000 as a cash deposit with a promise to pay $3,000 later. Minchew never came up with the $3,000, and to make matters worse, Moore (without Sellner's knowledge) later returned the $2,000 partial deposit to Minchew. Minchew later assigned a one-half interest in the sales contract to the Gudelsky Company (Gudelsky), yet Moore did not advise Sellner of the assignment. *Id.* at 395, 247 A.2d 523. At settlement, Sellner signed the deed and other closing documents, but Gudelsky and Minchew refused to settle unless they were granted a 60 foot irrevocable right of way. They made this demand despite the fact that purchasers were not entitled to it under the contract.

Moore knew, prior to settlement, that the purchasers were going to make this demand for an irrevocable right of way but did not tell Sellner. *Id.* at 398, 247 A.2d 523. Moore subsequently prepared an agreement whereby he (Moore), Sellner and another agreed to pay an attorney $5,000 if the attorney could obtain the right of way. Moore then tore off the signatures on the agreement of everyone but his client, Sellner. Ultimately, Sellner's land was condemned before the land was conveyed. Nevertheless, Moore sued Sellner for a real estate commission. The Court said:

> In common with most of the courts of this country we have held that a real estate "broker is a fiduciary." *Silverman v. Kogok*, 239 Md. 71, 210 A.2d 375 (1965). In his dealings with his employer he "is bound to act *in good faith* and to make disclosures of matters that are material and might affect the action of his employer in the premises." *Coppage v. Howard*, 127 Md. 512, 523, 96 A. 642 (1916). (Emphasis added.) It has been said that the seller "in the employment of an agent to sell his property bargains for the disinterested skill, diligence and zeal of the agent for his own exclusive benefit," *Raisin v. Clark*, 41 Md. 158, 159 (1874). In *Raisin* the Court, speaking through Judge Miller, said also:
>
>> "It is a confidence necessarily reposed in the agent, that he will act with a sole regard to the interest of the principal as far as he lawfully may. The seller of an estate is presumed to be desirous of selling it at as high a price as can fairly be obtained for it, and the purchaser is equally presumed to desire to purchase it for as low a price as he may. The interests of the two are in conflict. . . . *But if the same party be allowed to act as agent for both it becomes his interest to have this maxim reversed,* or at least to sacrifice the interests of one or both of his principals in order to advance his own by receiving double commission. *Hence the law will not permit an agent of the vendor whilst that employment continues, to assume the essentially inconsistent and*

*repugnant relation of agent for the purchaser." Id.* at 159–60. (Emphasis added.)

That a broker may forfeit his right to compensation by misconduct, breach of duty or lack of good faith is a proposition which is now well established. *Hardy v. Davis,* 223 Md. 229, 164 A.2d 281 (1960); *Goss v. Hill,* 219 Md. 304, 149 A.2d 10 (1959); *Slagle v. Russell,* 114 Md. 418, 80 A. 164 (1911); *Herb Tillman Co. v. Sissel,* 348 S.W.2d 819 (Mo.Ct. App.1961).

*Id.* at 398–99, 247 A.2d 523 (emphasis added.)

*Homa, supra,* concerned an attorney, Leonard Homa, who agreed to serve as "Counsel/manufactured housing consultant" for Friendly Mobile Manor, Inc. (Friendly), which owned two trailer parks. *Id.* at 343, 612 A.2d 322. Homa arranged for the sale of a trailer park but failed to notify his client (Friendly) that, after settlement, he planned to invest in the purchasing company. Homa also fraudulently misrepresented the meaning of a contractual provision to his client and as a result the purchaser was allowed to delete the provision. Moreover, Homa failed to notify Friendly that his son worked for the purchaser. We observed that "Homa's position vis-à-vis [the purchaser] was material and in direct conflict with the pecuniary and negotiating interest of his client, Friendly," *id.* at 346, 612 A.2d 322, and citing *Sellner, supra,* held that Homa's breach of his fiduciary duties "resulted in a forfeiture of his rights to the compensation he received from Friendly in the transaction."

The common denominator in *McGinnis, Sellner,* and *Homa* is that the person who sought the commission acted as a "double agent." Accordingly, those cases stand for the unremarkable proposition that an agent who has violated his or her fiduciary duty not to represent a client in a transaction in which the agent has any adverse interest, without the disclosure to the client of that interest, should receive no commission.

■■■ This case is unlike those Maryland cases in which disgorgement has been held to be an appropriate remedy.

Weinberg and Green did not represent two sides in the cases for which it overbilled. Moreover, in the Maryland cases cited by Fairfax, the agent's dual representation so infected the client-agent relationship as to make the agent's services either worthless or so nearly worthless as to make the value difficult to ascertain. By contrast, it is undisputed that the firm rendered valuable services to Fairfax and other Berman-related entities in the matter for which there was overbilling. The value of those services was agreed to by the firm and the client, i.e., standard rate less fifteen percent. Under such circumstances, we agree with *Dresser Industries, Inc., supra,* that a law firm is not obliged to disgorge all fees. The remedies that exist against a lawyer who fraudulently over-charges a client are already potent. Both actual and punitive damages may be awarded if the attorney is sued. Additionally, severe sanctions, including disbarment, may be imposed by the Maryland Court of Appeals if a grievance is filed. We deem those sanctions adequate. *See also Arizona Electric Power Co-op., Inc. v. Berkeley,* 59 F.3d 988, 992 (9th Cir. 1995) (while some authority exists for disgorgement when an attorney has acted unethically, the "better view" is that some reasonable allowance for fees should be made) (citing *In re Matter of Chicago & West Towns Railways,* 230 F.2d 364, 369 (1956)), *cert. denied,* 351 U.S. 943, 76 S.Ct. 837, 100 L.Ed. 1469 (1956); *Mar Oil, S.A. v. Morrissey,* 982 F.2d 830, 840 (2d Cir.1993) (in a case where an attorney overcharged his client by several hundred thousand dollars and received payment by making unauthorized withdrawals of over $900,000 from a trustee account, the Court held that the attorney was not required to disgorge his entire fee because, under New York law, attorneys "may be entitled to recover for their services, even if they have breached their fiduciary obligations"); *Newman v. Silver,* 553 F.Supp. 485, 496 (S.D.N.Y.1982), *aff'd in pertinent part, remanded in part on other grounds,* 713 F.2d 14 (2d Cir. 1983) (attorney who unconscionably overcharged his client and thereby breached his fiduciary duty nevertheless is entitled to the fair value of services rendered); *Petition of Rosenman & Colin,* 850 F.2d 57 (2d Cir.1988) (same). *Cf.*

*Gilchrist v. Perl,* 387 N.W.2d 412, 415–16 (Minn.1986) (attorney who breaches his fiduciary duty to his client must forfeit all fees).

## Punitive Damages and an Accounting

Appellant asserts in a footnote in its brief: "[The firm] also never discussed with Fairfax its possible claim against [it] for punitive damages, or Fairfax's right to a complete accounting conducted by an independent auditor to determine the actual extent of the overbilling." Fairfax makes no effort to prove that this is true. Fairfax makes no reference to any document or any portion of either the joint record extract or the record to support that assertion. Except for the sentence quoted above, the issue was not briefed. That argument is therefore waived. *See* n. 2, *supra. See also ACandS v. Asner, et al.,* 344 Md. 155, 177, 686 A.2d 250, 261 (1996) ("Inasmuch as the parties have not briefed the factual aspects of their legal contention . . . we do not decide that issue, even for guidance at trial."). Moreover, Fairfax did not even attempt to show that the alleged failure to advise Berman was material.[25]

## Disclosure of the Nature and Extent of Overbilling

Fairfax also claims that the trial court "did not credit the testimony" of any of the firm's witnesses who had first-hand knowledge of what disclosures were made to Berman by the firm and thus the court relied solely upon "disclosure documents" given to Berman. This is untrue. The trial court did observe that "compounding the difficulty of assessing the evidence on [the disclosure] issue is the lack of credibility the

---

**25.** According to lawyers who had dealt with Berman, he was extremely litigious and liked to sue others for fraud. In January 1988, when he signed releases and accepted $110,599 for the firm's fraud, he had recently sat through a fraud trial in which Fairfax had been sued for both actual and punitive damages. Under these circumstances, telling Berman that a person who commits fraud can be sued for punitive damages would be like telling Senator Robert Dole that he needed 270 electoral votes to become President.

court can accord the testimony of the main players." The "main players" were identified as Hess, Ronald Creamer, Howard Miller, and Berman. In concluding that the firm made full disclosure, the court considered both the disclosure documents and the testimony of the "main players." She said:

> Taken as a whole, with particular emphasis given to the documents provided, the evidence proves that Berman was aware the three proposed repayment amounts pertained to more than one account, case and file. The Court finds that W & G made full disclosure of material facts surrounding the overbilling.
>
> The Court further finds that in the Fall of 1987, W & G disclosed to Berman on behalf of Fairfax a systematic, computerized scheme implemented to overbill him. The scheme had been in place for several years and encompassed multiple accounts. Berman wanted to know exactly what Hess had done and demanded to see documentary backup. In response, he received from Hess a sample computer sheet which demonstrated how the time was inflated. Berman recognized that he had a serious problem.
>
> Berman knew that Fairfax had to investigate the nature and extent of the wrongful conduct. He recognized the importance of protecting himself and Fairfax, but decided against consulting outside counsel. W & G did nothing to entice counsel or cause Fairfax not to pursue claims or file suit as a result of the overbilling. Berman was not thwarted from pursuing his claim by any improper promise extracted by Hess. The Court further finds that soon after disclosures were made, Berman told Weiner what W & G had done and expressed his pleasure at the prospect of recovering substantial amounts of money.

There was ample support for those findings.

Appellant next asserts that the documents he was given by the firm "do not reveal that there was overbilling in any matter other than [in the] Ellerin [litigation]." The disclosure

set forth in the joint record extract (Exh. DX1769) clearly disproves this claim.[26]

 Appellant also complains that prior to Fairfax settling with the firm for the overbilling fraud, the firm should have given him the pre-bills showing how each account was billed, prior to the fifteen percent "write-up." Fairfax fails to show how the absence of the prebills was material. The firm's obligation to Fairfax was to make full and fair disclosure of the fraud. To do this, the firm was not obligated to turn over every document that showed that a bill had been increased by fifteen percent so long as they truthfully revealed what they had done. Once the firm told Berman of the systematical method it used to overbill the Berman-related entities, there was no need to prove that which had already been admitted. Appellant made no showing that the prebills that were given to Fairfax in discovery in connection with the subject case showed greater overbilling than was the sum for which Fairfax had been reimbursed.

### *"Undisputed Facts"*

Appellant refers to several facts that it characterizes as "undisputed." It claims the trial judge "overlooked" these facts. Appellant says that "Fairfax was falsely told that Hess acted alone" in overbilling Fairfax. It then cites to a portion of the joint record extract that sets forth what Berman says he was told by Hess on September 13, 1987—the date when Berman first learned of the firm's overbilling. Fairfax cites to no other part of the joint record extract as to this point. In the pages of the joint record extract containing Berman's testimony that is referred to by Fairfax, Berman did not testify that Hess told him that he acted alone. Moreover, this (alleged) fact was plainly not undisputed. Judge Harrington found that Berman was told in the fall of 1987 that the firm had used a "systematic, computerized scheme" involving multi-

---

26. A summary sheet given to Berman shows fees for all work and then shows adjustments for the matters settled separately, i.e., the *Ellerin* and *Zurich* litigation.

ple accounts to overbill him. She also found that Berman even asked to see and was shown how the computer program worked. Lastly, the trial court plainly disbelieved Berman's account of what he claimed the firm told him prior to December 31, 1987.

Appellant also claims that Fairfax should have been alerted as to Mr. Carbine's "worst case" estimate of Fairfax's cost. Fairfax characterizes as "undisputed" the fact that Carbine had concluded that the firm's exposure to Fairfax "as a result of the overbilling fraud was approximately $713,000 rather than the $475,000 offered by Miller...." Fairfax refers to the fact that Carbine made some rough notes that were introduced into evidence. In the notes he wrote three figures, i.e., $213,000; $110,000; and $390,000. The $213,000 figure had nothing to do with Fairfax. It concerned the *Zurich* litigation. The remaining $500,000 of the estimate had two components, $390,000—as possible exposure for the *Ellerin* litigation—and $110,000—as shown by Carbine's audit.

Fairfax knew exactly how the firm arrived at the $110,000 figure (see discussion *supra*). The $390,000 was Carbine's estimate of what Fairfax had already paid in fees in the *Ellerin* litigation. Based on Howard Miller's testimony, which the trial judge evidently believed, together with the disclosure documents received by Berman, appellant knew that it had spent approximately $430,000 in the *Ellerin* litigation at the time it accepted a check from the firm for $265,000. But according to Miller's testimony, from $160,000 to $190,000 of those expenditures would not have been recoverable even if the fee petition had not been withdrawn, because these were fees incurred by Fairfax for fighting Sherwood's bankruptcy. In short, Berman received from Miller essentially the same information as contained in Carbine's notes, prior to signing the releases. Appellant failed to demonstrate that Carbine's estimate was material.

**Issue 4. Did the trial judge commit reversible error by requiring that Fairfax prove the inadequacies of the firm's disclosure of its billing fraud?**

Appellant argues that the trial judge "erroneously held that Fairfax had the burden of proving the legal insufficiency of [the firm's] billing fraud disclosures." The court said:

> Plaintiff bears the burden to prove that, in the Fall of 1987, W & G failed to disclose the information that the law requires and/or W & G's failure to advise Fairfax in writing to seek independent counsel renders the executed releases invalid and unenforceable.
>
> On its separate claim of malpractice arising from W & G's representation of Fairfax in the face of a conflict resulting from the billing fraud, Plaintiff must prove either that it received inadequate disclosure of information on which it based the decision to waive the conflicts or that the billing fraud created a conflict that could never be cured and waived.

In support of its "wrong burden of proof argument" appellant relies on two cases dealing with the burden of proof in equity cases when there is a disputed transaction between an attorney and his clients. *See Hughes v. McDaniel,* 202 Md. 626, 633, 98 A.2d 1 (1953) (burden on attorney to prove by convincing evidence that he made "a perfectly honest and complete disclosure of all the information which he had" concerning the transaction); *Baker v. Otto,* 180 Md. 53, 55, 22 A.2d 924 (1941) (same). The first eight counts of Fairfax's Second Amended Complaint (the Complaint) set forth causes of action at law—not equity. As to the law counts, the trial judge indisputably set forth the correct burden of proof. As we recently said in *Mattingly v. Mattingly,* 92 Md.App. 248, 262–63, 607 A.2d 575 (1992):

> In an action at law, the person claiming the existence of a confidential relationship has the burden of proving that the relationship exists and that fraud by the defendant injured the plaintiff. *Lackey v. Bullard,* 262 Md. 428, 433, 277 A.2d 593 (1971). As the Court of Appeals has recognized, the burden of proving fraud in such an action at law is a "heavy one" and may only be met with "clear and convincing proof." *Id. In a suit in equity, however, if a plaintiff established the*

*existence of a confidential relationship, the burden shifts to the defendant to establish that the plaintiff's actions were "free, voluntary and unbiased." Mullan v. Mullan,* 222 Md. 503, 506, 161 A.2d 693 (1960).

(Emphasis added.)

The final count in Fairfax's complaint (Count IX) asked for an accounting—an equitable remedy. In regard to Count IX, the court said, "Fairfax asks this court to exercise its equity powers and order an accounting at [the firm's expense] to determine the precise amount of overbilling. For the following reasons, the court declines this request as unwarranted: ... 4) The claim is outside the statute of limitations." In its brief, Fairfax makes no argument challenging the correctness of the court's ruling that a judgment would be entered in favor of the firm on Count IX because limitations barred an accounting.[27] Having failed to claim any error regarding this ruling, the issue of who had the burden of proving entitlement to an accounting is immaterial.

**Issue 5. Did the trial court err in concluding that the conflict of interest created by the billing fraud could be waived?**

In the lower court Fairfax contended that the firm's billing fraud created a conflict of interest with Fairfax that was so serious that Fairfax could not waive it. This contention was the basis of their claim of malpractice and constructive fraud as it related to the conduct of the *Ellerin* litigation. According to Fairfax, because the firm had an unwaivable conflict of interest but nevertheless proceeded to act as counsel for Fairfax in *Ellerin,* Fairfax was entitled to recover all damages Fairfax suffered as a result of the loss of the *Ellerin* litigation

---

**27.** Technically, the doctrine of laches, rather than the statute of limitations, barred the claim. In a case such as this, that technicality makes no difference. *Villarreal v. Glacken,* 63 Md.App. 114, 128, 492 A.2d 328 (1985) (if an "analogous legal action would have been barred, the equity action will also be barred by the mere lapse of time, without the necessity for a showing of prejudice.").

and all fees paid to the firm for their representation in that litigation. Fairfax contended, *inter alia,* that the firm was so fearful that Fairfax might retain new counsel that it did not give Fairfax objective advice as to whether it should join Alderman as a third-party defendant in the *Ellerin* litigation. Fairfax maintained in the lower court that this failure to withdraw, even though the firm was ethically required to do so, denied it the right to have objective counsel.

The trial court disposed of the contention regarding the firm's failure to sue Alderman as follows:

> Prior to any systematic overbilling, attorneys from W & G discussed with Berman whether or not to sue Alderman. It was Berman's belief that the public would be offended if Fairfax sued the well-known Towson attorney. Further, he did not want Alderman as an enemy. Additionally, Berman knew that if Alderman were brought into the case, he would sue W & G and they would no longer be able to represent Fairfax in the *Ellerin* matter. Berman was adamant that W & G remain in the case and not abandon him; therefore, he made the decision not to allow Alderman into the case.

> As the *Ellerin* cases continued, after the billing fraud was disclosed, W & G again discussed these matters with Berman. The issue of whether or not to allow Alderman in the case was discussed several times with Berman after he learned of the billing fraud. When *Ellerin II* resulted in a hung jury, Steven Caplan ("Caplan") expressed his belief to Berman that Fairfax should sue Alderman. Berman rejected this suggestion and continued to express his desire that W & G remain as trial counsel.

\* \* \*

> W & G did not try to keep outside counsel away from the *Ellerin* litigation at all costs. W & G made several requests for Fairfax to consult outside counsel, and was open to the strategy of permitting or forcing Alderman into the *Ellerin* case, whatever the consequence. It was Berman who chose

not to have outside counsel examine the work W & G had done, despite his knowledge of the billing fraud.

\* \* \*

No credible evidence was presented that W & G intentionally lost the *Ellerin* litigation, or gave strategic advice to keep the billing fraud from being discovered. Despite the overbilling inflicted on Fairfax, the evidence supports the finding that the trial team working on the *Ellerin* litigation was not compromised by the indiscretion of fellow attorneys. The trial team gave reasonable advice to Fairfax throughout the *Ellerin* trials.

The Court finds that Berman, on behalf of Fairfax, validly waived the conflict of interest that arose from the billing fraud. Fairfax is not entitled to compensatory damages because it did not prove the elements of either malpractice or constructive fraud.

Fairfax does not object to the court's finding that Berman, on its behalf, waived the conflict, but criticizes the court's "hindsight analysis" in regard to whether the conflict, in fact, interfered with the firm's representation of it. The short answer to this criticism is that the court was obliged to use a "hindsight analysis" to determine whether the firm (as Fairfax alleged) sought to keep Alderman out of the case due to the firm's fear that if Alderman was sued the firm would have to withdraw and the billing fraud would be exposed.

Rule 1.7 of the Maryland Rules of Professional Conduct provides, in pertinent part:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation.

 As Fairfax points out, some conflicts are so serious that they may not be waived. "When a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent." Md. Rule 1.7 cmt. "The critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client." *Id.* " 'The test for determining whether there is an impairing conflict is probability, not certainty.' " *Tydings v. Berk Enters.*, 80 Md.App. 634, 639, 565 A.2d 390 (1989).

 The trial judge recognized that some conflicts could not be waived and evaluated the testimony of three experts on the subject to determine waivability. Fairfax called a law professor, Charles Wolfrum, and a practicing attorney, Wilbur Preston, as experts. Professor Wolfrum correctly defined an unwaivable conflict as one "which a disinterested lawyer would advise a client not to waive." According to Professor Wolfrum, the hypothetical disinterested lawyer must use an objective test and not base his or her decision on his subjective belief as to the fairness of a particular lawyer. Using this test, Professor Wolfrum opined that the billing fraud created an unwaivable conflict that required the firm to withdraw from representing Fairfax despite the disclosures made and the

releases signed by Berman.[28] Wilbur Preston, a well-respected Baltimore trial lawyer, concluded that the firm had an unwaivable conflict of interest based on the billing fraud. Preston, however, was unable to give specific reasons to support this assertion.[29]

Thomas Murphy, a lawyer with substantial experience in the application of ethical principles to the practice of law, testified for the firm. The trial judge accepted Murphy's conclusions and (impliedly) rejected those of Wolfrum and Preston. Mr. Murphy's testimony and the court's evaluation of it were summarized:

> Murphy testified that W & G's overbilling of Fairfax created a conflict of interest because it made W & G's interest paramount to the client's. However, Murphy explained that this conflict did not mandate withdrawal. According to Murphy, when a lawyer overbills a client, the lawyer incurs two obligations: (1) the lawyer must disclose the overbilling to the client; and (2) the lawyer must remedy any harm done to the client. With regard to the degree of disclosure necessary to allow a valid waiver, appropriate and adequate information must be given to the client so the client can appreciate its significance. If these obligations are performed to the client's satisfaction, Murphy opined that the conflict caused by overbilling is cured. The lawyer's interest is no longer superior to the client's.

> In his opinion, W & G made adequate disclosures of the billing fraud to Berman and paid fair compensation to

---

**28.** None of the testimony of Professor Wolfrum is in the joint record extract. Some of the testimony, however, is summarized in the trial judge's opinion, and we have paraphrased that summary. *See* n. 2, *supra.* Neither party challenges the correctness of the trial judge's summary. The trial judge did not summarize the reasons given by Professor Wolfrum for his opinion.

**29.** Wilbur Preston testified, *inter alia,* that the fact that the firm's attorneys were material witnesses to the transactional work in *Ellerin* and to events that occurred when Fairfax attempted to levy on property in the home of one of the General Partners after the first *Ellerin* trial, made the conflict unwaivable. On appeal, Fairfax does not claim that this conflict was unwaivable.

remedy the harm caused. In making this assessment, Murphy noted that Berman is a sophisticated businessman with access to many lawyers from well-regarded law firms to assist him. He also considered the $275,000 paid for the fee petition withdrawn in the *Ellerin* litigation, and the $90,000 paid for the dismissal of the *Zurich* matter as a result of the overbilling.

Murphy also based his opinion on evidence of Berman's satisfaction with the resolution which he found in statements Berman made to Weiner shortly after W & G disclosed the overbilling and Berman's statements to Miller in January 1988 that he was happy with the way things were resolved and wanted to move forward.

In his opinion, the conflict that existed between W & G and Fairfax because of the billing fraud had been cured and therefore could be waived by Fairfax.

The Court finds this testimony persuasive. The inherent conflict caused by the overbilling was resolved to the satisfaction of Fairfax. Once the conflict was cured, it ceased to exist. The court is not persuaded that, despite the cure of the conflict, a lawyer would be forever barred from further representation of a client in this situation.

 The sole argument put forth by Fairfax as to why the trial court was clearly erroneous when it held that the conflict was waivable is because (allegedly) a disinterested lawyer would have concluded that the firm's post-billing fraud "would likely color [the firm's] advice with regard to any issue that might result in the billing fraud being revealed." This leads to the question: On what issue in the *Ellerin* litigation might a disinterested lawyer conclude that the firm's advice could be compromised by the prior overbilling? On the issue of whether the fee petition should be reinstated, Fairfax answers. Fairfax's support for that answer is unorthodox—at least if one is attempting to prove that the trial court was clearly

erroneous.[30] Rather than point to any testimony by any witness, expert or otherwise, who testified that a disinterested lawyer would come to this conclusion in regard to reinstatement of the petition, Fairfax simply posits that the risk is too great and goes on to another issue. Left undiscussed by Fairfax is why *any* attorney would advocate reinstating the fee petition in the *Ellerin* case.

Obviously, if all competent lawyers would answer "No" to a legal question posed by a client, then an attorney with a conflict who also answers "No" has not allowed the conflict to color his or her judgment. It was undisputed that trial counsel for the guarantors and General Partners had subpoenaed the "back-up" documents for the fee petition. If the petition had been reinstated, discovery of the billing fraud would have been inevitable. To say the least, this would not have been a favorable development from Fairfax's viewpoint because the central issue in the *Ellerin* trial was the honesty, *vel non*, of Blum and other members of the firm. As far as is shown by the briefs and joint record extract, there was not a scintilla of evidence that any competent lawyer would have given any answer other than "No" if the question arose as to whether the fee petition should have been reinstated. Therefore, the trial judge did not err in accepting the testimony of Mr. Murphy and ruling that the conflict was waivable.

## V.

Fairfax raises five additional arguments that, for completeness, will be addressed.

1. Weinberg and Green's Failure to Withdraw In The Face Of The Unwaivable Conflict Made It Liable For The Outcome Of *Ellerin* And Required It To Disgorge All Fees That It Was Paid By Fairfax While The Conflict Existed.

---

**30.** The trial court held that Fairfax had failed to prove the conflict was not waivable.

The sole premise for this argument is that the conflict was unwaivable. It was not. *See* Part IV, Issue 5, *supra.*

2. The Trial Court Erred In Concluding That Fairfax Released Its Claim For Legal And Equitable Relief Arising Out Of W & G's Billing Fraud.

Legal and equitable relief was denied for several reasons—one of which was that the statute of limitations barred them. The trial judge did not err when she ruled that the transactional malpractice claims and those for fraud and constructive fraud were barred by limitations. *See* Part IV, Issues 1 and 2, *supra.* The court's ruling that the statute of limitations barred the equitable claim (accounting) set forth in Count IX was not appealed. Because these claims were barred for other reasons, it is immaterial as to whether they were also barred by release.

3. The Trial Court Erred In Holding That Fairfax's Conflict Claim Arising Out Of W & G's Billing Fraud Was Barred By The Doctrine Of Unclean Hands.

The trial court entered judgment on all negligence counts "to the extent that these counts address any conflict of interest resulting from" the overbilling of Fairfax for the following reasons:

A. Fairfax did not prove that there was any remaining conflicts of interest following the disclosure and resolution of the overbilling in 1987 and 1988;

B. The untruthfulness of Fairfax's witnesses in this trial required the conclusion that Fairfax does not have clean hands to pursue this relief.

The trial court was correct in regard to Reason A. *See* Part IV, Issue 5, *supra.* It is immaterial as to whether she was also correct as to Reason B.

4. The Trial Court Applied Incorrect Principles Of Proximate Causation In Concluding That Fairfax Could Not Recover For W & G's Transactional Malpractice.

This argument is immaterial because the transactional malpractice claim was barred by the statute of limitations. *See* Part IV, Issue 1, *supra.*

 5. The Trial Court Erred In Concluding That Fairfax's Claim Arising Out Of W & G's Transactional Malpractice Was Barred By The 10K Release.

This argument, too, is immaterial because the statute of limitations barred this claim. *See* Part IV, Issue 1, *supra.*

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**